Submitted on appellant's petition for reconsideration filed July 29; and on respondent's motion to dismiss; alternatively, response to appellant's petition for reconsideration filed August 15, reconsideration allowed; former opinion (149 Or App 220, 942 P2d 829) modified; affirmed September 24, 1997

STATE OF OREGON ex rel
Jack R. ROBERTS,
Commissioner of the
Oregon Bureau of Labor and Industries,
*Appellant,*

*v.*

ACROPOLIS MCLOUGHLIN, INC.,
an involuntarily dissolved Oregon corporation,
and Haralambos Polizos, individually,
*Respondents,*

*and*

Konstantinos POLIZOS,
*Defendant.*

(9503-01597; CA A93158)

945 P2d 647

Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, and Mary H. Williams, Assistant Attorney General, for petition.

Gordon L. Osaka and Williams, Zografos & Peck, *contra*.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

## RIGGS, P. J.

The Oregon Bureau of Labor and Industries (BOLI) has filed a petition for reconsideration of our opinion in this case, *State ex rel Roberts v. Acropolis McLoughlin, Inc.*, 149 Or App 220, 942 P2d 829 (1997), contending that we erroneously determined that BOLI did not preserve its first two assignments of error and did not request *de novo* review of the record. We allow reconsideration, modify our former opinion and affirm the trial court.

BOLI brought this action under ORS 653.010 *et seq* to enforce the minimum wage provision for dancers working at "The Acropolis," the club of defendant Acropolis McLoughlin, Inc. (Acropolis). BOLI sought injunctive and declaratory relief with regard to dancers dancing at The Acropolis after September 1993, which the court denied on the ground that the dancers were not employees entitled to minimum wage. The specific circumstances of each claim and the court's dispositions are set forth in our original opinion. *Acropolis McLouglin*, 149 Or App at 222.

On appeal, the state framed the questions presented:

"Does the 'economic realities test' based on the federal Fair Labor Standards Act apply to a determination whether individuals are employees or independent contractors for purposes of the state minimum wage provisions pursuant to ORS chapter 653?

"Under the economic realities test, does the evidence support the conclusion *as a matter of law* that the dancers in the defendant club are employees and not independent contractors?

"If the economic realities test does not apply to the definitions in ORS 653.010, under the common law factors the trial court presented in the jury instruction, does the evidence support the conclusion *as a matter of law* that the dancers in the defendant club are employees and not independent contractors?" (Emphasis supplied.)

For its first assignment of error, BOLI said:

> "The trial court erred in denying the state's claim for declaratory relief."

For its second assignment of error, BOLI said:

> "The trial court erred in denying the state's claim for injunctive relief."

In its statement of the standard of review, BOLI said:

> "This court reviews the trial court's application of the common law test instead of the economic realities test for distinguishing employees from independent contractors and the question of the dancers' status for errors of law.
>
> "Complaints for injunctive relief are proceedings in equity. This court reviews *de novo* to determine whether the evidence presented justifies the granting of injunctive relief. ORS 19.125. Similarly, where a declaratory judgment proceeding is in the nature of a suit in equity, this court tries all factual issues *de novo*." (Citations omitted.)

The first portion of BOLI's argument was directed at its contention that the trial court

> "erred in refusing to apply the 'economic realities' test to determine whether the dancers working for defendant after September 1993 were and are employees or independent contractors."

The portion of its brief addressing that contention asserted that the trial court erred as a matter of law in not applying the economic realities test to decide whether the dancers working at The Acropolis after September 1993 were and are employees.

In our opinion, we concluded that because BOLI argued to the trial court that criteria of both the economic realities and common-law tests should be considered, BOLI had not preserved its argument on appeal that *only* the economic realities test is applicable. We adhere to that conclusion. In its petition, BOLI now contends that its position on appeal is merely that the unique factors of the economic realities test should be *considered* in making the determination of an employment relationship. Contrary to the implication of BOLI's argument, it is clear that the trial court did consider

factors from both the economic realities and common-law tests. In the light of the argument made to the trial court that criteria of both tests are applicable, there was no error.

BOLI says in its petition that

"[o]ne of the reasons for pursuing this appeal is BOLI's interest in having this court determine *which* test applies to state minimum wage cases." (Emphasis supplied.)

This court will take up that question when it is argued on appeal *and* preserved at trial.

In the second portion of its argument under the first two assignments of error, BOLI argued that under the economic realities test, "the evidence in this case" shows that dancers working for defendant after September 1993 were employees. We disposed of that contention, along with the first contention, for the reason that, in the light of the arguments made to the trial court, there could be no error in failing to apply the economic realities test exclusively. We adhere to that determination.

Finally, in the remaining portion of its brief addressing the first and second assignments of error, BOLI contended that, even under the trial court's modified common-law definition of employee, the dancers should be considered employees of Acropolis. Although no assignment specifically asserted error in the trial court's findings, as opposed to its application of the law, we give BOLI the benefit of the doubt and now conclude that BOLI's final argument under the first and second assignments of error can be read as a request for *de novo* review. The question that we consider on *de novo* review is whether, under the mixed economic realities/ common-law standard formulated by the parties for the trial court, the court erred in finding that the dancers after September 1993 were not employees of Acropolis. The court's jury instructions, which are not challenged on review and which encompass the legal standard that the parties presented to the court, are set out in full in our former opinion.[1]

---

[1] As we noted in our former opinion, claims for the period *before* September 1993, were tried to a jury. We do not review *de novo* the jury's findings with respect to those claims.

149 Or App at 227. We summarize the pertinent facts, as we find them:

The Acropolis is open from 11:00 a.m. until 2:00 a.m., seven days a week. The club has been in existence since 1976 and has provided entertainment in the form of nude dancing since 1988. It provides meals, alcoholic beverages and nude dancing during all hours of operations. Haralambos Polizos is the manager of The Acropolis and president of the defendant corporation, Acropolis McLoughlin, Inc. Polizos advertises the business of The Acropolis on the building marquee and through a yearly calendar containing pictures of nude or partially dressed women. Meals at The Acropolis are about one-half of the price of meals at restaurants that do not provide nude dancing entertainment.

From April 1991 to September 1993, the hiring, scheduling and management of dancers was the job of Don Cloud, who was an employee of Acropolis. Dancers auditioned for Cloud and the customers, bartenders and waitresses, but only waitresses and bartenders made the decision whether to hire a dancer. Waitresses, bartenders and Polizos' son, Konstantinos, kept a list of those dancers who would not be permitted to return to The Acropolis. Cloud was required not to schedule those dancers. Dancers worked in three shifts. Polizos decided how many dancers were needed and how many stages would be open for each shift; Cloud scheduled the dancers. Dancers paid no fee to Cloud.

From June 1991 to January 1993, dancers were paid minimum wage by Acropolis for all shifts, and Acropolis issued to dancers and Cloud Internal Revenue Service W-2 Forms reflecting their wages and withholdings. In January, Polizos decided that during the busier shifts the dancers were earning enough in tips alone and did not need to be paid wages. He continued to pay minimum wage to those dancers working the quieter shifts on Sunday and Wednesday afternoons and to those who complained that they had earned no tips on a shift. He was aware of the minimum-wage law but was not aware that tips could not be counted against the minimum wage.

Dancers were required to abide by rules established by Polizos, which included complying with requirements of

the Oregon Liquor Control Commission (OLCC): No drugs, no prostitution, no stage props, no touching of customers or self, no "table dancing" and remaining at least one foot from the customer. Dancers were required to arrive about 15 minutes early for their shifts and, until September 1993, were not permitted to wear street clothes on stage during their performance. There was a dressing room on the premises. Dancers showed their identification to a bartender or doorman when they arrived, to determine whether they were above minimum age. Until September 1993, dancers were also required to check in at the bar before their work shift and sign out at the bar after their shift. The first dancer to arrive for a shift got to leave first. If a dancer arrived late for her shift, the bartender or waitresses would report that to Polizos or Cloud. If a dancer did not show up for a shift at all, the last dancer to arrive for the previous shift was required to stay and dance a second shift. Dancers reported their work hours to Cloud, who maintained records for each dancer. In their five-hour shifts, dancers performed four-song sets, taking breaks between sets and while other dancers performed their sets. Until September 1993, dancers and staff of The Acropolis brought their concerns to Polizos. After September 1993, dancers were required to bring their concerns only to the agent.

Dancers were not required to have specialized training. All testified that they had had nude dancing experience before dancing at The Acropolis. Dancers provided their own costumes and taped music and were responsible for developing their own routines. Bartenders and waitresses controlled the tape player and its volume to accommodate the competing needs of customers, waitresses and dancers. Before September 1993, dancers were expected to wear high heels when they danced and to remove all their clothing by the fourth song in their set. One dancer testified that if dancers wore street clothes during the finale, the bartender would turn off the music, and the dancers would not be allowed to go home until all the dancers were either nude or in costume. Dancers had no say in the operation of The Acropolis.

In September 1993, Polizos terminated Cloud's employment and arranged for an agency by the name of "Hot Stuff" to schedule dancers for The Acropolis. Hot Stuff leased

stages at The Acropolis for $500 per month and agreed to provide dancers for the shifts Polizos established. Dancers requested shifts from Hot Stuff and picked up their "bookings" from the offices of Hot Stuff. Hot Stuff would try to schedule dancers for their requested performance times, but it was not always possible. Dancers paid Hot Stuff a $2 to $4 booking or stage rental fee for booking them at The Acropolis. Dancers were not required to accept a booking from Hot Stuff. Acropolis no longer paid wages to dancers for any shift. It issued no W-2 Forms to dancers or to Hot Stuff.

After it entered into its agreement with Hot Stuff, Acropolis no longer was involved in the disciplining of dancers. If a bartender or waitress had a concern about a dancer, that concern would be brought to Hot Stuff. If a dancer had a concern, she would address it to Hot Stuff. Dancers reported violations of OLCC rules to Hot Stuff. Dancers notified Hot Stuff of performance cancellations; Hot Stuff booked a replacement dancer. Waitresses and bartenders notified Hot Stuff if a dancer did not show up, and Hot Stuff provided the replacement. If dancers timely canceled a performance, their booking fee was returned. If they canceled late, they forfeited their booking fee and their next performance.

Dancers signed a service agreement with Hot Stuff, in which they agreed that they were an independent business with a separate business telephone listing, that they were not solely dependent on Hot Stuff and that they booked their performances through at least one other agency or performed at least at one club that was not booked by Hot Stuff. Dancers testified that they did not contribute to the terms of their agreement with Hot Stuff. Hot Stuff printed business cards for dancers. Dancers performed at several clubs in addition to The Acropolis.

In April 1994, Polizos terminated Acropolis' relationship with Hot Stuff and entered into a similar agreement with an agency run by Brett Owenby, who had worked previously for Hot Stuff. In August 1994, Polizos terminated Acropolis' relationship with Owenby and began dealing with Michael Henry, doing business as Star Promotions (Star).

Star originated in 1992 and characterizes itself as an entertainment coordinator, booking dancers not only at The Acropolis but also at three other establishments. Star Promotions pays Acropolis $100 per month to lease stages at The Acropolis, and Henry receives a bonus from Acropolis of approximately $100 per month for doing a good job. Star uses space for its office in Acropolis' empty warehouse and pays no rent. Defendants have no input into the terms and conditions of the dancers' contracts with Star. Dancers audition for Star at a location other than The Acropolis. Under their agreements with Star, the dancers are "volunteers" who "donate their time and talent to perform on said stages." Dancers have no input as to the terms and conditions of the agreements with Star. A dancer who wishes to dance at The Acropolis must schedule a shift through Star.

Dancers pay Star a stage rental fee of $4 to $7 for performing at The Acropolis, depending on the time of performance, and dancers' income comes exclusively from customer tips. As under Hot Stuff, dancers are paid no minimum wage by Acropolis. They are free to chose their own stage name, hair style, costume, music and dance routine. They provide their own music and determine how much of their costume they will remove. They are not required to undress completely and can wear whatever they want on stage, even street clothes. They are free to do what they want in between their performances, except that they must wear a "cover-up" if they circulate among the customers.

Dancers have monthly meetings at Star's office. Dancers developed and voted on their own list of Conduct Recommendations, with input from Polizos and The Acropolis bartenders and waitresses. After September 1993, dancers no longer check in at The Acropolis bar and are no longer required to perform a finale.

At the relevant time, Acropolis employed 27 bartenders, waitresses, cooks and doormen. Those employees were required to punch a time clock. Acropolis scheduled their work time, determined their compensation, coordinated work and vacation schedules and hired and fired them. Those employees were paid an hourly wage of $5 to $7. They were provided with one free meal and drink per day. Cooks and

doormen were provided with uniforms, and bartenders and waitresses were required to dress in black and red. Each employee had a 10-minute break after lunch time.

In contrast to the circumstances of waitresses, bartenders, cooks and doormen, dancers did not punch a time clock. They were not provided with a free meal or drink. Acropolis did not schedule their work hours or vacations. They did not receive a 10-minute break. Acropolis cross-trained its waitresses and bartenders. It did not cross-train dancers. Bartenders, waitresses, cooks and doormen attended monthly meetings with Polizos. Dancers did not attend those meetings but attended only their separate meetings at the office of Star. There was testimony from dancers and Cloud that, although tipping by dancers was not required, it was "traditional" for dancers to tip bartenders, waitresses and doormen. There was testimony from one dancer that bartenders started their shifts with 100 one dollar bills that they would give customers change in one dollar bills to be used to tip dancers and that bartenders would not give one dollar bills as change if they did not like the dancer. There was testimony that a doorman was terminated for demanding a tip from a dancer.

Polizos rents his stages for private parties for $90 for two hours. When there is a private party, Polizos requests two additional dancers from Star. On two occasions, when stages leased by Star needed repairs, Acropolis made the repairs.

Several dancers testified at trial. Susan Mazur testified that she danced at The Acropolis from August 1992 to April 1994, and that her job was to "try to promote beer sales by entertaining the guys, making them want to stay there and come back and want to spend their money." In 1992, 1993 and 1994 she filed federal and state income tax returns in which she declared herself to be a self-employed dancer, taking business expense deductions for makeup, tanning, costumes and jewelry. She and the other dancers who testified said that they regarded themselves as self-employed and that they worked with other booking agents who would book performances for them at other establishments.

A jury found that, with regard to wage claims prior to September 1993, the dancers' relationship with Acropolis was one of employment. In BOLI's view, the changes that occurred in September 1993 in the day-to-day management of the dancers did not alter the relationship of the dancers and Acropolis. Although there was evidence that the September 1993 changes in the management of the dancers did not affect many of the factors that were relevant to the court's inquiry, considering all of the criteria that the trial court had before it we find that the relationship between Acropolis and the dancers after September 1993 was not one of employment:

(1) The durations of the relationships of the dancers and The Acropolis. With the exception of four or five dancers, dancers typically danced at The Acropolis intermittently, for brief periods, and simultaneously worked for other clubs.

(2) The right or lack of right of Acropolis to control the method of doing the work. BOLI argues that Acropolis and its various booking agents after 1993, especially Star, were not sufficiently distinct to be treated separately for the purpose of the determining whether Acropolis had a right to control the dancers. In other words, although Acropolis purported to book dancers for its club through an agent, the agents were connected so closely to Acropolis, rather than to the dancers, that Acropolis had not relinquished control over the dancers. In our view, the evidence shows that the entities were separate. Unlike Cloud, Henry was not compensated as an employee by Acropolis. Although Star received no fee from Acropolis for its services, it used Acropolis space for its office, rent free. Although Star "leased" stages from Acropolis, it received a monthly bonus equal to the lease amount. Acropolis had no say in the agreements between Star and the dancers. From its office space, Star booked dancers for other clubs. Contrary to BOLI's contention, these facts lead us to conclude that the entities were separate. We find, as BOLI contends, that Acropolis' use of a booking agent did not mean that Acropolis had given up control of its stages; it retained control of the general venue and circumstances of the dancers' work, such as the stage to be danced on, the length of the shift, the number of stages used, and the length and number of sets. However, we find, additionally, that the dancers

were not subject to the control of either Acropolis or the agent with regard to the manner of performing their work.

(3)   Form of payment. Dancers were not paid by Acropolis or Star but through customer tips only. As BOLI points out, this factor is of relatively little weight here, where the issue is whether Acropolis *should* have been paying minimum wage to the dancers.

(4)   Equipment. Dancers provided their own equipment including costumes, makeup and music. The stage that Acropolis provided was not equipment but the situs of the performance. *See Cy Investment, Inc. v. Natl. Council on Comp. Ins.*, 128 Or App 579, 584 876 P2d 805 (1994).

(5)   Extent to which dancers' income depended on their skills. Although dancers were not required to have any specific training to dance at The Acropolis, the evidence was that their tips were 80 percent dependant on their ability to entertain, which included their dancing and personal skills and their ability to use makeup and costumes. Evidence also was introduced that tips were dependant in part on a dancer's physical appearance, which, of course, is not exclusively a question of skill.

(6)   Acropolis' right to discipline or fire dancers. There is no evidence that either the Acropolis or the agent ever fired a dancer. When a dancer decided not to dance at The Acropolis, there was no requirement to notify Acropolis. The dancer simply asked the agent not to schedule a shift.

(7)   The parties' view of their relationship. The dancers testified that they regarded themselves to be self-employed.

(8)   Control over opportunity for profit. BOLI takes the position that the dancers' opportunity for profit was, in fact, dependant on Acropolis, through its provision of the venue, its setting of general shift times and lengths, its control of the number of dancers and stages used, control of music volume and exclusive control of the operation of The Acropolis. Certainly, the dancers could not have earned income from dancing at The Acropolis in the absence of that venue. There was testimony, however, that a dancers' profits were almost exclusively dependent on the skill of the dancer

and that dancers danced at other establishments, not just The Acropolis.

At trial, BOLI took exception to the trial court's failure to instruct the jury that the relative investments of the parties in the business is a factor to be considered in determining the nature of the relationship. Although no assignment of error challenges the trial court's failure to instruct the jury on that factor, BOLI asserts on review that, in considering the post-September 1993 period, that factor weighs in favor of an employment relationship. BOLI contends that the investments made by the dancers in their costumes and music are minimal compared to Acropolis' investment in its business, which includes the building, seating, stages, food, beverages and service. Defendants note that a dancer's investment goes beyond the mere physical trappings of the work, such as costume and music, and includes skill and experience, which cannot be measured comparatively.

Further, BOLI asserts, the trial court erred in failing to consider the extent to which the dancers are an integral part of Acropolis' business. BOLI notes that the dancers are featured in advertising and that The Acropolis' food prices are low because The Acropolis' beverage sales are enhanced by the presence of dancers. It contends that both this factor and the investment factor go to the essence of the "economic realities" test: the dependence of the dancers on The Acropolis for their earnings.

Were it not for the fact that the dancers testified that they danced at other establishments as well as The Acropolis, we might be persuaded by BOLI's arguments concerning the need to consider factors bearing on dancers' economic dependence. Additionally, the economic reality with regard to each dancer necessarily depends on the circumstances of the individual dancer, evidence that is not in this record. We are not persuaded that the two criteria aid in the determination of an employment relationship in this case.

Considering the factors discussed, we conclude that they weigh in favor of the determination that the relationship between Acropolis and the dancers after 1993 was not one of employment. Accordingly, the trial court did not err in

holding that Acropolis was not subject to minimum-wage requirements for the dancers after 1993.

Our findings apply as well to the claims of Susan Mazur. BOLI's third assignment of error challenged the trial court's granting of defendants' motion for directed verdict with respect to the assigned wage claim as it relates to the dancer Mazur for the time period after September 1993. In our first opinion, we concluded that there was evidence from which it could be found that Mazur was an employee. On *de novo* review, we conclude now that there was no employment relationship.

Reconsideration allowed; former opinion modified; affirmed.