Argued and submitted March 15, affirmed November 9, 2011

Joseph M. DINICOLA,
*Plaintiff-Appellant,*

*v.*

STATE OF OREGON,
Department of Revenue,
*Defendant-Respondent.*

STATE OF OREGON,
Department of Revenue,
*Third-Party Plaintiff,*

*v.*

SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 503,
*Third-Party Defendant.*

Marion County Circuit Court
07C14758; A138659

268 P3d 632

Kevin T. Lafky argued the cause for appellant. With him on the briefs was Lafky & Lafky.

Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiff is employed as a tax auditor in the Oregon Department of Revenue (Revenue). When he is working in that position, he is entitled under state and federal law to compensation at one and one half times his regular hourly rate for any work beyond 40 hours a week. He appeals a judgment that denied his claims against the state for overtime pay for the period that he was on release time from his job with Revenue and serving as the full-time president of his union, Local 503 of the Service Employees International Union (Local 503).[1] We affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

Because the trial court granted the state's motion for summary judgment, we state the facts most favorably to plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). Plaintiff has worked for Revenue as a tax auditor since 1987. In August 1997, Revenue reclassified his position as nonexempt under the Fair Labor Standards Act (FLSA). Since then, he has received time and a half for all overtime that he has worked, except during the period from November 2004 through November 2008 when he was president of Local 503. While he was president, he worked substantially more than 40 hours a week on union matters.

Because the Collective Bargaining Agreement (CBA) between Local 503 and the state created plaintiff's right to release time from his job with Revenue while he was president of Local 503, we begin with it. Article 10 of the CBA provides several arrangements for compensating agency employees while they are engaged in union activities. Under sections 10 through 12, union stewards may use their regular work time to investigate and process employee grievances and to represent employees during investigatory interviews. The agency pays stewards at their regular rate for that time, and Local 503 has no obligation to reimburse the agency for

---

[1] Plaintiff brought this action against Revenue, which in turn brought a third-party claim for indemnity against Local 503. The trial court granted both defendants' motions for summary judgment and entered judgment in their favor, and the court denied plaintiff's motion for summary judgment. Revenue is the only defendant involved in this appeal.

those payments. For its part, the agency has no obligation to pay stewards for work on grievances that they perform outside regular work hours. The first part of section 13 of Article 10 provides that stewards may also attend the annual stewards' conference, and that various other union officials and members may attend its annual meeting, by taking personal leave, vacation leave, or other leave to which they would be entitled without regard to their roles in the union.

These provisions assume that the union official remains primarily an agency employee who occasionally does union work or participates in union activities. The requirement that the agency pay stewards when they work on grievances during their regular working hours is known in labor relations terms as a "no-docking" provision. *See Machinists Local #964 v. BF Goodrich Group*, 387 F3d 1046, 1052-53 (9th Cir 2004) (describing no-docking provisions permitted under the National Labor Relations Act, 25 USC § 158(a)). It is the only such provision in the CBA. In all other circumstances, the CBA requires employees to use leave that they could otherwise use for other purposes if they wish for the state to pay them while they are on union business.

Unlike other state employees who occasionally participate in union affairs, as president of Local 503, plaintiff worked full time for the union. The second part of section 13 of Article 10 applies to his situation. It provides that the union president and the union business manager

"shall, at his/her request, be given release time from his/her position for a period not to exceed the term of his/her office for the performance of Union duties directly related and central to the collective bargaining relationship. * * * The Union shall, within thirty (30) days of payment to the President * * *, reimburse the State for payment of appropriate salary, benefits, paid leave time, pension, and all other Employer-related costs."

Under the CBA, thus, plaintiff retained his existing position with Revenue, and all of its benefits, while he worked full time for Local 503. However, during the period he was on release time from Revenue, Local 503 bore the ultimate financial burden of his compensation by reimbursing Revenue for what Revenue paid plaintiff.

In early February 2005, Local 503 and Revenue expanded on section 13 of the CBA by adopting Agreement #1281 (the Agreement), which authorized release time for plaintiff as union president.[2] The Agreement provided that plaintiff would "retain all rights, benefits and privileges of his current position and classification," that his status would not change, and that he would "remain in his permanent classification." Plaintiff would also receive any salary adjustments for which he was eligible, and he would be able to list his experience as president as part of his qualifications for future promotions. Although plaintiff would remain in his current classification and receive the compensation of that classification, and the Agreement required plaintiff to turn in time sheets to Revenue, Local 503 was obliged to "reimburse Revenue for payment of salary, benefits, paid leave time, pension and all other employer-related costs. All overtime, comp time earned and travel expenses will be reimbursed by [Local 503] to Revenue." As a result of this provision, and consistently with the CBA, Revenue had no net expense arising from plaintiff's continuing status with it.

When plaintiff reviewed the Agreement before the parties signed it, he sent an e-mail to Local 503's business manager pointing out that as president he did not receive overtime and did not bill Revenue for his expenses. He suggested letting the issue go unless the business manager thought that it was necessary to point it out to Revenue. That portion of the draft Agreement remained unchanged in the final version.

During his terms as president, plaintiff worked an average of 60 to 65 hours a week. He kept accurate records of his time, which he provided to Local 503's business manager. However, at her instructions, he reported only 40 hours a week on the state timesheets that he turned in to Revenue. In accordance with the Agreement, the state paid him his regular compensation, including wage increases that

---

[2] Although the Agreement expressly covers only plaintiff's first term as president, from November 2004 to November 2006, it appears that Local 503 and Revenue continued to operate under it during plaintiff's second term without formally renewing it. Plaintiff reviewed the Agreement before its execution, signed it as a Revenue employee, and was fully aware of its terms. Two Revenue managers also signed the Agreement for Revenue, and the executive director signed for Local 503.

occurred during that period, and provided him with basic health and retirement benefits, and Local 503 reimbursed Revenue for those amounts. In addition, Local 503 paid plaintiff additional compensation of $400 a month and provided him with other benefits, such as a flexible medical benefit and a car allowance. During the four years that he was president of Local 503, plaintiff worked a total of nine hours for Revenue, all involving assisting Department of Justice lawyers on the resolution of one of his cases going to trial; otherwise, he worked exclusively for Local 503.

Plaintiff did not seek overtime compensation for his work with Local 503 until February 2007, shortly after his election to his second term. He testified that that was when he first concluded that he was entitled to overtime. At that time, he submitted revised timesheets to Revenue showing the hours that he had reported to Local 503. Revenue refused to pay him for the additional hours of work that he had performed for the union beyond 40 hours per week, as recorded on those timesheets. Plaintiff then filed this action against Revenue to recover overtime pay, asserting both statutory claims under the FLSA, 29 USC §§ 207, 216(b), and state wage and hour laws and common-law contract, quasi-contract, and negligence claims.

The trial court granted Revenue's motion for summary judgment on all claims and denied plaintiff's cross-motion on the statutory and contract claims. The court wrote a comprehensive opinion primarily concerning the statutory claims, ruling that plaintiff was not Revenue's employee for purposes of overtime compensation and was an exempt employee while he was working as president of the union. The court also rejected plaintiff's argument that the CBA and the Agreement require that he be paid overtime wages as a nonexempt employee of Revenue. On the tort claims, the court found that plaintiff could not prevail because he did not rely on any representation by Revenue to his detriment and knew that he would not receive overtime pay as president of the union.

## II. ANALYSIS

Plaintiff assigns error to the granting of Revenue's motion for summary judgment and the denial of his. Summary judgment is appropriate if there is no genuine issue of

material fact for trial, and the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Garrison v. Deschutes County*, 334 Or 264, 266, 48 P3d 807 (2002). When the material facts are not in dispute, we review the trial court's rulings for errors of law. *Oregon Southwest, LLC v. Kvaternik*, 214 Or App 404, 413, 164 P3d 1226 (2007), *rev den*, 344 Or 390 (2008).

At its heart, plaintiff's position is simple: Revenue employed him in a position in which he was entitled to overtime compensation; he remained in that position, although on release time, after he became president of Local 503; and he worked substantial overtime for which Revenue has not paid him. At the least, he argues, he was a joint employee of Revenue and Local 503, and his status as a Revenue employee who was entitled to overtime continued to apply. He also argues that the nature of his work during his terms as president was not such as to make him exempt from the overtime provisions of the state and federal minimum wage laws. Revenue disputes all of those assertions, arguing that the economic reality of plaintiff's situation was that he was solely an administrative employee of Local 503 who was exempt from legally required overtime pay.

We conclude that plaintiff was an employee of Local 503 for purposes of overtime pay and that his entitlement to such compensation depends on the work that he did in that employment, and not on his continuing formal relationship with Revenue, the job description for his tax auditor position with Revenue, or the audit work that he did for Revenue before becoming president. We also conclude that his work for Local 503 made him an exempt administrative employee. Because the parties focus on plaintiff's status as an employee under federal law, we begin our discussion there.

A.  *Plaintiff's employment as union president under the FLSA*

We turn first to the issue of whether plaintiff was an employee of Revenue for purposes of the FLSA overtime pay provisions during his two terms as union president. As a preliminary matter, we reject the state's contention that plaintiff had no employment relationship with Revenue while he was working as union president. While he worked almost

exclusively as president of Local 503, he formally remained a continuing employee of Revenue in his permanent classification, on release time for a period not to exceed his term as president. In that status, he received his pay and employee benefits from Revenue rather than directly from the union, and he accrued vacation and sick leave time with Revenue. But the mere fact that plaintiff had a continuing formal relationship with Revenue does not lead ineluctably, as plaintiff argues, to the conclusion that Revenue was his employer for purposes of the overtime pay he seeks under the FLSA.

Our analysis begins with the relevant statutory definitions in the FLSA. Section 3(e) of the FLSA, 29 USC § 203(e), defines "employee" as "any individual employed by an employer." Section 3(d), 29 USC § 203(d), defines "employer" to include, among others, "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency[.]" That definition does not otherwise indicate what makes a person an employer. Thus, the central definition for our purposes is that of "employ" in section 3(g), 29 USC § 203(g), which is "includes to suffer or permit to work." We have noted that the federal courts hold that that definition is broader than the traditional common-law test of employment. *State ex rel Roberts v. Acropolis McLoughlin, Inc.*, 149 Or App 220, 223-24, 942 P2d 829, *modified on recons*, 150 Or App 180, 945 P2d 647 (1997) (discussing meaning of phrase in ORS 653.010(3), which is derived from the FLSA). Quoting *Goldberg v. Whitaker House Coop.*, 366 US 28, 33, 81 S Ct 933, 6 L Ed 2d 100 (1961), the Ninth Circuit stated that the "touchstone" for whether an employer-employee relationship exists under the FLSA is the "economic reality" of the parties' relationship. *Bonnette v. California Health and Welfare Agency*, 704 F2d 1465, 1469 (9th Cir 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 US 528, 539, 105 S Ct 1005, 83 L Ed 2d 1016 (1985).

Courts examine numerous nonexclusive factors to determine the "economic reality" of a relationship under the FLSA, with some factors focused on the regulation of the employee and some on nonregulatory aspects of the relationship. *See, e.g., Torres-Lopez v. May*, 111 F3d 633, 639-40 (9th Cir 1997) (discussing both as stated in regulations under the

Migrant and Seasonal Agricultural Worker Protection Act, 29 USC §§ 1801-72). In general, the factors revolve around the amount of economic dependence that the individual has on the alleged employer, *Antenor v. D & S Farms*, 88 F3d 925, 929 (11th Cir 1996), and the control that the alleged employer has over the individual. *Bonnette*, 704 F2d at 1470 (focusing on whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records). No single factor controls, and courts are to consider the circumstances of the whole activity. *Boucher v. Shaw*, 572 F3d 1087, 1091 (9th Cir 2009). In this case, there is no question that some entity suffered or permitted plaintiff to work and that he was an employee under the FLSA; the issue is who suffered or permitted him to work.

The parties first dispute whether Revenue was plaintiff's employer instead of the union. Plaintiff looks only at the factors listed in *Bonnette* to contend that Revenue was his sole employer, whereas Revenue focuses attention on additional factors. Most notably, Revenue argues that plaintiff worked directly for and on behalf of the union; Revenue did not fund plaintiff's compensation as union president; and the union provided plaintiff's work site and the tools to perform his job as president.

Because plaintiff's situation was one variation of a pattern that is common in collective bargaining agreements in both the public and private sector, we look at cases that discuss those variations for assistance. Collective bargaining agreements provide a variety of ways for an employee to work part or full time for a union while retaining his or her status as an employee. For this case, we can divide collective bargaining agreements into, first, those with no-docking provisions, such as the provisions in this CBA that apply to stewards processing employee grievances and under which the employer pays the employees for their time and the union does not reimburse the employer, and, second, those in which the union either pays the employee directly for the union work or reimburses the employer for what it has paid the

employee. Although neither we nor the parties found a helpful case that deals with a claim under the FLSA, discussions of the nature of similar employment arrangements in other contexts are useful in understanding plaintiff's claims that Revenue was his employer and owes him overtime pay.

Several federal courts have discussed the legality of no-docking provisions under section 302(a) of the Labor Management Relations Act (LMRA), 29 USC § 186(a), which prohibits an employer from paying anything to an officer or employee of a labor organization that represents the employer's employees. The courts generally uphold those provisions under the exception stated in section 302(c)(1) of the LMRA, 29 USC § 186(c)(1), which permits payments that are either for or by reason of the employee's employment. Two such cases involve employees who worked full time as union stewards processing grievances but whom the employer had agreed to pay, without any reimbursement from the union.

In *Caterpillar v. United Auto. Workers of America*, 107 F3d 1052 (3rd Cir), *cert granted*, 521 US 1152 (1997), *cert dismissed*, 523 US 1015 (1998), the union defended the arrangement in part by suggesting that the stewards, who were on leaves of absence from their regular jobs, were joint employees of both the union and the employer. The court rejected that suggestion because the stewards did nothing for the employer's benefit. *Id.* at 1055. The mere fact that they "remain on the Caterpillar payroll and fill out the appropriate forms and time sheets to get paid is legally irrelevant." *Id.* The court nevertheless upheld the employer's payments on the ground that it made them by reason of the stewards' past services to the employer and that they arose out of the collective bargaining agreement itself rather than the kind of back door deal that the statute was designed to prevent. *Id.* at 1056.

In *Machinists Local #964*, BF Goodrich contended that it need not pay a maintenance mechanic elected as the union's full-time shop steward his wages and benefits as agreed upon in the collective bargaining agreement because the shop steward was not providing services to BF Goodrich. 387 F3d at 1051. The court, relying on *Caterpillar*, again rejected the argument that the full-time union steward "must

be an employee of BF Goodrich simply by virtue of the fact that he remains on the company's payroll and continues to maintain a formal job classification." *Id.* at 1057. The statute authorized payments for a person's services as an employee, not for a person who merely had that formal status. *Id.* Nevertheless, the court held that the steward was an employee of BF Goodrich because his work benefited the company by helping to resolve labor-management disputes peacefully and because the steward had an office on the shop floor rather than in a union hall, was not classified as being on a leave of absence, and worked under the company's direct and immediate supervision. *Id.* at 1059.

Although *Caterpillar* and *Machinists Local #964* take somewhat different approaches and reach different conclusions, they both look to the reality of a specific situation and not to formal titles in determining whether a union member who is doing union work full time remains an employee for purposes of the LMRA. Even the fact that the employer paid the employee's full compensation without union reimbursement was not decisive.

The employee status of union members who, by virtue of election to a union position, spend substantial amounts of time on union business also arises in cases involving statutory limits on the political activities of public employees. In two state cases, the union reimbursed the public employer for the employee's time spent on union activities. Also in each case, the court concluded that formally remaining a public employee does not necessarily bring a person within the statutory prohibitions.

In *Michigan State AFL-CIO v. Michigan Civil Serv. Comm'n*, 455 Mich 720, 566 NW2d 258 (1997), the Michigan Supreme Court invalidated an administrative rule that, among other things, prohibited public employees who received union officer leave from using that leave for partisan political activity. The union officers spent over 25 percent of their time on union business, and the union reimbursed the employer for the total cost of the officers' wages, insurance, and retirement benefits while they were doing union work. Because of that reimbursement, the court noted, "the employer does not pay any compensation to these employees

for the use of union officer leave." *Id.* at 735, 566 NW2d at 264. As a result, the rule violated a state statute that permitted state employees to engage in political activities in some circumstances. *Id.*

Finally, in *Pinto v. State Civil Serv. Comm'n*, 590 Pa 311, 912 A2d 787 (2006), the Pennsylvania Supreme Court considered a collective bargaining agreement under which the plaintiff was entitled to leave from his state employment during his term as a full-time union officer. Under the agreement, the state agency paid the plaintiff his salary and benefits, and the union, consistently with an applicable state statute, repaid the agency the full cost of that compensation. The union also gave the plaintiff an additional amount to bring his pay up to the level that it provided for the office that he held. 590 Pa at 315, 912 A2d at 790. The plaintiff argued that, as a result of these arrangements, his leave was unpaid and the limitation on political activities did not apply. *Id.* at 319, 912 A2d at 792. The court was sympathetic to that argument, but it ultimately held that it did not need to decide the issue. What was decisive, rather, was that the plaintiff had taken a leave of absence to engage in full-time employment in a non-civil service position. *Id.* at 321-22, 912 A2d at 794. As a result, the statute did not apply to him. *Id.* at 323, 912 A2d at 795. In opposing that result, the state argued that, because the plaintiff continued to accrue retirement seniority credits, he was on a "regular" leave of absence. The court found that argument to be highly problematic, noting that "the only functional difference between these statuses, by the Commission's own account, was who signed Appellant's checks, as it is undisputed that the Association ultimately paid all of Appellant's employment costs." *Id.* at 325, 912 A2d at 796.

All of these cases focus on the employee's actual work in deciding who is the employee's employer. They uniformly hold that work that is solely on behalf of the union is not work for an employer that nominally—or even actually—paid the employee's wages. Even in *Machinists Local #964*, where the court concluded that the employee's work processing grievances was in part for the employer's benefit, the court emphasized that simply remaining on the company's payroll and maintaining a formal job classification was insufficient to make the person an employee. In this case, plaintiff

relies heavily on his continuing status as a Revenue employee who received his pay directly from Revenue, who received the increases in compensation that other Revenue employees in his classification received, and who remained theoretically subject to discipline and termination by Revenue. None of these courts considered any of those things as decisive or even very important. Rather, consistently with the test under the FLSA, they looked closely at the work that the employee actually performed. These courts even treated employees subject to no-docking provisions, where the employer rather than the union ultimately paid their wages for union activity, as employed by the union.

As noted, the FLSA defines "employ" to include "suffer or permit to work." We have also noted that that definition is broader than the traditional common-law test of employment and that it focuses on whether the person is an employee as a matter of economic reality, which in turn rests largely on the kind of work the person performs and economics of who controls and benefits from the person's work. As the LMRA and public employee political activity cases suggest, and as Revenue argues, as a matter of economic reality, plaintiff was an employee of Local 503 for purposes of overtime pay under the FLSA during his terms as its president. During that time, the union was responsible for plaintiff's compensation, and plaintiff served the union's interests as its presiding officer and chief spokesperson and representative. Even under the broad definition of the term "employ" under the FLSA, plaintiff was not an employee of Revenue. With the exception of nine hours to cooperate with Department of Justice lawyers to resolve an outstanding case going to trial in 2005—the kind of task that former employees are sometimes called upon but are not compelled by virtue of an employment relationship to perform by their former employers—Revenue did not suffer or permit plaintiff to work; Local 503 did. The trial court did not err in rejecting plaintiff's argument that Revenue was his sole employer.

Plaintiff next argues that Revenue and Local 503 were his joint employers because they jointly suffered or permitted him to work. He relies on cases such as *Bonnette*, *Torres-Lopez*, and *Antenor* in support. Under those cases, the focus of the analysis is whether the economic reality of the

situation makes the employee economically dependent on the putative employer. The issue is not whether the employee is more dependent on one employer than another, but whether he or she is dependent on the putative employer at all. *Antenor*, 88 F3d at 932. The factors for determining who is the employer that plaintiff derives from these cases include the putative employer's power to hire or fire the employee; its power to supervise and control the employee's work; its power to determine the rate and method of payment; its preparation of payroll and payment of the employee's wages; its maintenance of employee records; and its ownership of the facilities where the work occurred. Plaintiff also recognizes that, as the court emphasized in *Antenor*, there is no mathematical formula that can determine the relative significance of those factors. Rather, they are aids for the court to use as indicators of the employee's economic dependence on the putative employer. *Id.* at 932-33. Because the discussions in the other cases are consistent with *Antenor*, and because the facts of that case illustrate the differences between plaintiff's situation and that of a true joint employment, we will focus on it.

In *Antenor*, farm workers who were employed by a farm labor contractor brought a claim under the FLSA and the Migrant and Seasonal Agricultural Worker Protection Act against growers on whose farms they had harvested beans. 88 F3d at 928. The contractor hired the workers and put them to work in the fields in accordance with instructions from the growers. The growers determined when picking would start, when it would end, and what rows of beans the employees would pick. Both the contractor and the growers supervised the employees' work, ensuring that they picked correctly. The growers paid the contractor based on the number of boxes picked, and the contractor then paid subcontractors, who ultimately paid the employees. However, the grower was financially unable to purchase workers' compensation insurance covering the employees, and the growers withheld money from their payments to the contractor to purchase such insurance. The growers were named insureds on the policies. The growers also subtracted the appropriate social security taxes from what they paid the contractor. *Id.* at 927-28. They gave the contractor a separate check for the

employers' and employees' shares of those taxes to ensure that the contractor paid the required amounts. *Id.* at 936. The court also emphasized that the employees performed a routine job that was integral to the employers' business. *Id.* at 937.

After evaluating the totality of the circumstances, the Eleventh Circuit in *Antenor* concluded that the employees were economically dependent on the growers as well as on the contractor. *Id.* at 938. The court explained:

> "The growers exercised a measure of control in terms of the numbers of pickers needed and the specific hours of work. They exercised a measure of supervision and directly intervened in their work process. They involved themselves in the payroll process and in making provision for social security and workers compensations insurance when the labor contractor was too financially unstable to do so. The growers owned the facilities and controlled the overall production scheme in which the pickers performed an integral line job; and the growers, unlike [the contractor], had substantial investment in equipment and facilities that were necessary for the pickers' work."

*Id.* Thus, the growers and the contractors were joint employers of the employees, and the growers were liable for the workers' claims under the FLSA.

It is apparent that plaintiff's situation is not like that of the workers in *Antenor*. While he was president of Local 503, he formally retained his position with Revenue and received the compensation of his position, but those things were in fact formalities. Local 503 reimbursed Revenue for everything that Revenue paid plaintiff. Revenue retained no control over plaintiff's performance of his duties as president, nor did it have any right to discipline or discharge him for that performance. Aside from nine hours of work that did not reflect ongoing responsibilities, Revenue did not suffer or permit plaintiff to work for it while he was working as president. The reality was that he was economically dependent on Local 503 alone while he was on release time from his position with Revenue. He undoubtedly expected to return to that position once his union job ended, but that did not make him a joint Revenue employee under the FLSA in the interim. Although Revenue and Local 503 were in an ongoing

relationship, they were not engaged in a joint operation similar to the one that the court described in *Antenor*. Rather, they were parties on opposite sides of an arm's-length collective bargaining agreement, with plaintiff serving the union as its leader, well outside the purview of Revenue's management.[3] Plaintiff was, for purposes of the FLSA, employed solely by Local 503.

## B.  *Plaintiff's exempt status under the FLSA*

Our conclusion that plaintiff was not a Revenue employee for purposes of the FLSA while he was on release time, and thus is not entitled to overtime based on his position as a tax auditor, does not resolve the issue of his right to overtime under the FLSA. Whether he is entitled to overtime compensation does not depend on his formal status but on the nature of the work that he did as president of Local 503.[4] If he was entitled to overtime compensation for that work, the Agreement at least suggests that Revenue was obliged to pay it to him and that Local 503 was required to reimburse Revenue for those payments. Plaintiff contends that his work as union president did require overtime pay and that he was a nonexempt employee under the FLSA. We therefore turn to the relevant statutes.

Section 7(a) of the FLSA, 29 USC § 207(a), requires employers to pay their employees time and one half for all work over 40 hours in one week. However, section 13(a)(1), 29 USC § 213(a)(1), exempts "any employee employed in a bona fide executive, administrative, or professional capacity" from the statutory right to overtime compensation. The trial court found that plaintiff was an exempt administrative employee. Because we conclude that plaintiff was an administrative

---

[3] Plaintiff's situation, thus, is unlike that of the employee in *Machinists Local #964* whose work processing grievances on the shop floor "under the direct and immediate supervision of the corporate employer," the Ninth Circuit concluded, at least in part benefited the employer. 387 F3d at 1059.

[4] Indeed, even if we were to decide that plaintiff remained a Revenue employee, we would not treat that as conclusive of his right to overtime compensation. Plaintiff was entitled to overtime as a tax auditor because the work of that position did not qualify for any exemption from the FLSA's requirements. Once he stopped performing the work of a tax auditor, his right to overtime would depend on the work that he actually performed. *See, e.g.*, 29 CFR § 541.200(b), (c) (basing administrative exemption on work that is the employee's primary duty).

employee of Local 503 and therefore not entitled to overtime under the FLSA, we need not discuss the other exempt categories.

The FLSA itself does not define an administrative employee, but the Department of Labor has adopted administrative rules that do so. Under 29 CFR § 541.200, an administrative employee means an employee (1) who is compensated on a salary or fee basis at a rate of at least $455 per week, (2) whose primary duty is the performance of office or nonmanual work directly related to the management or general business operations of the employer, and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

For his compensation to be on a salary basis, plaintiff must regularly receive, on a weekly or less frequent basis, a predetermined amount that is all or part of his compensation and that is not subject to reduction because of variations in the quality or quantity of work that he performed. 29 CFR § 541.602(a). There is no question that as president of Local 503, plaintiff received compensation, ultimately paid by the union, that was greater than $455 per week, and he received his pay on a monthly basis. Regardless of his actual hours worked, he supplied Revenue with time records showing a 40-hour work week, and his pay while he was union president was never docked by Revenue. He argues, however, that his compensation was subject to reduction based on the quantity or quality of his work. He bases those arguments on Revenue's policies that applied to his position as a nonexempt tax auditor, not on Local 503's policies that applied to his position as its president. He also emphasizes that the Agreement provided that he retained the "rights, benefits, and privileges" of his position as a tax auditor. In taking that position, however, he does not recognize that, although he retained those rights, he was on release time from his position and the work that he performed was work for Local 503, not for Revenue. The policies that applied to him as a Revenue employee are simply not relevant to his status under the FLSA.[5] Plaintiff's work met the salary basis test.

---

[5] Plaintiff's argument that he theoretically could have been subjected to reduced pay for violating employee conduct rules even while working as union

We turn to the nature of the duties that plaintiff had as president of Local 503.[6] To qualify as an administrative employee, plaintiff's duties first must be directly related to the management or general business operations of the union. 29 CFR § 541.201(b). That means that his work must directly assist in running the union's business rather than carrying out its routine tasks. 29 CFR § 541.201(a). In addition, his primary duties must involve the exercise of discretion and independent judgment with respect to matters of significance. 29 CFR § 541.200(a)(3). That includes such things as comparing and evaluating possible courses of conduct and acting or making a decision after considering the various possibilities. 29 CFR § 541.202(a). Based on the record, the trial court found as a matter of law that plaintiff's primary duties were exempt administrative duties.

Plaintiff argues that there is a fact question for trial as to whether he was an exempt administrative employee because he was not a supervisor of any union or Revenue employees, and, although he could and did recommend policy decisions, he could not unilaterally mandate policy, that being within the province of the Board of Directors. Plaintiff's supervision of other employees, though, is not necessarily relevant to, and is certainly not determinative under, the duties analysis of an administrative employee required by the Department of Labor's regulations. Nor is it required that the employee be the sole policymaker for his employer.

Further, the union's Executive Director summarized the significant nature of plaintiff's activities as union president in an affidavit:

"Article IX of the Union's Bylaws sets forth the duties of officers including those of the president. Those duties include the authority or responsibility to: preside at meetings of the Union's ultimate governing body - the General

president, *e.g.*, by disclosing confidential taxpayer information, does not assist him. *See* 29 CFR § 541.602(b) (noting exceptions that allow pay docking for employees paid on a salary basis, including disciplinary action).

[6] Plaintiff argues that Revenue controlled his work because it permitted him to work as president of Local 503 and, indeed, provided him to the union for that purpose. The problem with his argument is that Revenue's actions were not a matter of its good will but something that the CBA required it to do. Nothing in the CBA suggests that Revenue retained any control over plaintiff's actions as president.

Council - as well as the Board of Directors and the Executive Committee; set the agenda for Board of Directors and Executive Committee meetings and act as Board administrator; serve as the chief spokesman for the Union; appoint the chairpersons and some members to standing and special committees; appoint and dissolve special committees; serve as ex-officio member of all standing and special committees; render a report to General Council on his administration and make any recommendations deemed appropriate; attend and represent the Union at all appropriate national and regional meetings; serve as a Union delegate to the SEIU International Convention; represent the Union on the Oregon State Council; assist in the development and oversight of the Union's internal and external communications program; determine whether certain grievances should be brought to arbitration; coordinate the activities of Directors and Assistant Directors to implement the Union's strategic goals, and; represent the union at the Legislature and in ballot measure campaigns. *Plaintiff has exercised all of the foregoing authorities on numerous occasions during his terms in office as union president."*

(Emphasis added.) The activities that the Executive Director described both directly assisted in running the business of the union and involved the exercise of discretion and independent judgment on matters of significance. Plaintiff does not dispute that he engaged in those activities as union president. We agree with the trial court that on this record, no trial was necessary. Plaintiff was an administrative employee under the FLSA and therefore was exempt from the overtime pay requirements under it.

## C. *Plaintiff's state statutory wage and hour claims*

We reach the same conclusion as to plaintiff's overtime pay claims under Oregon law, which in relevant respects is modeled on the FLSA. In ORS 653.010(2), the legislature adopted the FLSA's definition of "employ" for the purpose of the state minimum wage laws as including "to suffer or permit to work." Although we recognize that that definition comes from the FLSA, we have also used the common-law right of control test in deciding whether a putative employee is in fact an independent contractor and thus exempt from the coverage of the Oregon statutes. *See, e.g.,*

*Perri v. Certified Languages International, LLC*, 187 Or App 76, 81-83, 66 P3d 531 (2003); *State ex rel Roberts*, 149 Or App at 223-24. In this case, there is no assertion that plaintiff was an independent contractor. We therefore apply the FLSA test to resolve his state claims and reach the same conclusion that we reached under the FLSA. Thus, under analogous state law governing overtime compensation, plaintiff was an employee of Local 503 while he was its president.

Similarly to the FLSA, ORS 653.020(3) exempts an administrative employee from the rules that the Commissioner of the Bureau of Labor and Industries (BOLI) may adopt under ORS 653.261 concerning overtime compensation. That statute defines an administrative employee as one who performs predominantly intellectual, managerial, or creative tasks; exercises discretion and independent judgment; and earns a salary and is paid on a salary basis. BOLI, in OAR 839-020-0005(2),[7] expands on the statutory definition in ways that are consistent with the rules under the FLSA. *Accord* OAR 839-020-0320(2) (similarly describing public employees who are exempt because of the administrative nature of their duties). We again reach the same conclusion that we did under the FLSA and hold that plaintiff was an exempt administrative employee under Oregon law.

---

[7] As relevant here, that rule provides that an "Administrative Employee" means any employee:

"(a) Whose primary duty consists of * * *:

"(A) The performance of office or non-manual work directly related to management policies or general business operations of the employee's employer or the employer's customers; * * *

"* * * * *

"(b) Who customarily and regularly exercises discretion and independent judgment; and

"(c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity; or

"(A) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or;

"(B) Who executes under only general supervision special assignments and tasks; and

"(d) Who earns a salary and is paid on a salary basis pursuant to ORS 653.025 exclusive of board, lodging, or other facilities."

## D.  *Plaintiff's common-law claims*

Finally, we turn to plaintiff's contractual, detrimental reliance, and negligent misrepresentation claims. Each of those claims is based on the provisions in the Agreement authorizing release time that plaintiff would "retain all rights, benefits and privileges of his current position and classification"; that he would "not change his status and remain in his permanent classification"; and that "[a]ll overtime, comp time earned and travel expenses will be reimbursed by the Union to Revenue." Based on these statements, plaintiff argues that Revenue promised that he would remain a nonexempt employee entitled to overtime payments, that he relied on that promise, and that Revenue negligently misrepresented those things. The problem for plaintiff is that, although the Agreement provides for him to retain his status with Revenue, it does not state that his work for Local 503 while on release time will count as work for Revenue.

First, on his contract claim, plaintiff contends that, regardless of his statutory rights, he is entitled to overtime pay because those terms of the Agreement required Revenue to retain him in his nonexempt status under the FLSA and required pay for overtime work. It is reasonable to interpret the Agreement to provide that plaintiff would be entitled to overtime compensation as a nonexempt employee for any work that he did in his continuing status as a Revenue employee, but not for work that he performed for Local 503. It is also reasonable to interpret the Agreement's requirement that Local 503 reimburse Revenue for "all overtime" as determining the ultimate financial responsibility for any overtime payments to which plaintiff might otherwise be entitled, not as creating a right to them. Plaintiff himself stated shortly before the parties entered into the Agreement that he was not entitled to overtime pay and suggested the possibility of deleting that provision from the Agreement.

The determination of whether a contract is ambiguous presents a legal question. *See, e.g., Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994). A term in a contract is ambiguous if, when examined in the context of the contract as a whole, including the circumstances in which the agreement was made, it is susceptible to more than one

plausible interpretation. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 317, 129 P3d 773, *rev den*, 341 Or 366 (2006). In this case, the evidence of the circumstances in which the Agreement was made, especially plaintiff's release from his auditor duties to assume the full-time union leadership role funded by the union, and plaintiff's admission at the time of the Agreement's circulation that he was not entitled to overtime pay in that role, indicates that plaintiff's proposed reading of the Agreement is unreasonable. The Agreement cannot plausibly be read to state that plaintiff has a right to receive overtime compensation from Revenue for his work as union president. Because the Agreement is unambiguous, the trial court did not err in granting Revenue's motion for summary judgment on plaintiff's contract claim.

Finally, the trial court correctly concluded that plaintiff's own statement that he would not receive overtime pay for his work as union president, his work as union president for two years without receiving overtime pay, and his decision to continue in that capacity by again running successfully for president all resolve his detrimental reliance and negligent misrepresentation claims. Whatever the wording of the Agreement, plaintiff did not rely on any right to overtime stated in it when he first became president, before he entered into the Agreement. And, despite Revenue's personnel action forms stating that he was a nonexempt employee of Revenue, it is evident from plaintiff's statement and conduct that he did not rely on any right to overtime when he signed the Agreement several months later, or when he decided to serve again as president for a second term. Because a reasonable juror could not find detrimental reliance on this record, plaintiff's tort claims fail. *See Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) (reliance is a required element of a negligent misrepresentation claim); *Bixler v. First National Bank*, 49 Or App 195, 199, 619 P2d 895 (1980) (reliance is an element to establish estoppel to enforce a promise).

Because the trial court properly granted Revenue's motion for summary judgment on all of plaintiff's claims and denied plaintiff's motions, we affirm the general judgment dismissing this case.

Affirmed.