Argued and submitted November 29, 2012, award of attorney fees pursuant to ORS 20.105 reversed; award of enhanced prevailing party fee pursuant to ORS 20.190(3) vacated and remanded for reconsideration; otherwise affirmed December 18, 2013

CEJAS COMMERCIAL INTERIORS, INC.,
an Oregon corporation,
*Plaintiff-Respondent,*

*v.*

Jorge TORRES-LIZAMA
and Felix Torres-Lizama,
*Defendants-Appellants,*

*and*

VIEWPOINT CONSTRUCTION, LLC,
an Oregon limited liability company,
*Defendant.*

Multnomah County Circuit Court
100100532; A148291

316 P3d 389

D. Michael Dale argued the cause for appellants. With him on the briefs was Law Office of D. Michael Dale.

Roger J. Leo argued the cause and filed the brief for respondent.

Kenneth A. Kreuscher, Cathy Highet, and Portland Law Collective, LLP, filed the brief *amici curiae* for Oregon American Federation of Labor and Congress of Industrial Organizations, Oregon State Building and Construction Trade Council, International Union of Painters and Allied Trades District Council No. 5, and National Employment Law Project.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

DUNCAN, J.

## DUNCAN, J.

In this declaratory judgment action, defendants Felix and Jorge Torres-Lizama appeal a judgment declaring that they were not employed by plaintiff, Cejas Commercial Interiors, Inc., within the meaning of Oregon's minimum-wage law, ORS 653.025.[1] Defendants contend that plaintiff, a drywall contractor, was their employer while they did drywall work that plaintiff had subcontracted to Viewpoint Construction, LLC (Viewpoint). Consequently, defendants assert, plaintiff was required to compensate them for their work when Viewpoint and its crew foreman, Miguel Muñoz, failed to pay defendants and disappeared. Defendants also argue that the trial court abused its discretion in awarding plaintiff attorney fees of $5,000 and an enhanced prevailing party fee of $5,000 on a counterclaim that defendants raised under the federal Fair Labor Standards Act (FLSA), 29 USC §§ 201 to 219. We affirm the trial court's determination that plaintiff did not employ defendants under ORS 653.025, reverse the award of attorney fees, and remand for reconsideration of the enhanced prevailing party fee.

## I. FACTS AND PROCEDURAL HISTORY

After a bench trial, we review the trial court's factual findings for any competent evidence. ORCP 62 F; *Sutherlin School Dist. #130 v. Herrera*, 120 Or App 86, 91, 851 P2d 1171 (1993).[2] We state the facts consistently with those findings. *Sutherlin School Dist. #130*, 120 Or App at 91. Plaintiff is a construction contractor licensed by the Construction Contractors Board (CCB) and specializing in

---

[1] As explained below, the trial court entered a default judgment against defendant Viewpoint Construction, LLC, and Viewpoint is not a party to this appeal. Throughout this opinion, we refer only to Jorge and Felix Torres-Lizama as "defendants"; we refer to Viewpoint by name.

[2] We decline defendants' invitation, made in a footnote in their brief, to review the record *de novo*. *See* ORS 19.415(3)(b) (in an equitable action, we have discretion to review the record *de novo*); ORAP 5.40 (we exercise our discretion to review *de novo* only in "exceptional cases"). Defendants provide no support for their contention that this is an equitable case for which *de novo* review is discretionary under ORS 19.415(3), and, in any event, we would not exercise that discretion in this case. The only significant conflicts in the evidence in the record were the result of conflicting testimony, and the trial court made express credibility findings regarding that testimony that would carry great weight even if we were to review *de novo*. *See Niman and Niman*, 206 Or App 400, 420, 136 P3d 1186 (2006).

drywall, metal framing, and acoustical ceilings. Its Chief Executive Officer is Jose Ignacio Ceja, commonly known as "Nacho."[3] Plaintiff has a regular crew of eight to ten employees, most of whom are Ceja family members. Plaintiff's crew members fill out W-4s, have taxes withheld from their pay, and are paid semi-monthly by check.

In 2008, plaintiff contracted with general contractor Lorentz Bruun Co., Inc., to complete the drywall part of a mixed commercial and residential construction project at the intersection of 20th Avenue and Southeast Hawthorne Boulevard in Portland. The project, the largest that plaintiff had ever undertaken, was too large for plaintiff's crew to complete within Lorentz Bruun's desired timeframe, so Nacho Ceja decided to subcontract the "production" part of the contract to another company. Drywall production work involves hanging and taping full sheets of drywall on unobstructed walls and ceilings. Plaintiff's crew would do the remaining drywall work, which required more time and expertise than the production work. Plaintiff's crew's work included installing "pre-rock" and installing drywall around elevator assemblies and stairwells.

Plaintiff offered to subcontract the production work for $.28 per square foot, with "patches and additional work" extra, and several companies submitted bids. Nacho Ceja testified that that price was generous and provided an opportunity for a subcontractor to make a significant profit. Plaintiff decided to subcontract with Viewpoint, which had worked on smaller projects for plaintiff in the past and with whose work Nacho Ceja had been satisfied. Plaintiff supplied the drywall, tape, and mud for the drywall work that Viewpoint was to perform; Viewpoint's workers provided their own tools.

Before plaintiff awarded Viewpoint the contract, Nacho Ceja used the CCB's website to confirm that Viewpoint had an active license with the CCB and was bonded and insured. Nacho Ceja also required Viewpoint to provide a liability insurance certificate showing plaintiff as

---

[3] Throughout this opinion, we refer to Jose Ignacio Ceja as Nacho Ceja to avoid confusion with his nephew, Jose Ceja, Jr., who, as explained below, was plaintiff's on-site supervisor for the relevant drywall project.

an additional insured and to add plaintiff as an insured on its workers' compensation insurance.

Victor Rodriguez, Viewpoint's principal, signed the contract on behalf of Viewpoint. During performance of the contract, Rodriguez came to the site only periodically to pick up checks from plaintiff. Plaintiff paid Viewpoint in full under the contract; the last check was deposited on May 21, 2009.

Defendants Jorge and Felix Torres-Lizama are brothers. At the time relevant to this action they lived together in Vancouver, Washington. Miguel Muñoz, the foreman for Viewpoint's taping crew, called them at home and asked them to work on the drywall for the 20th and Hawthorne project. Both defendants had worked on crews headed by Muñoz before. Neither had ever been on plaintiff's payroll, although Felix believed that he had worked on another job where plaintiff had had the drywall contract. Defendants had not heard of Viewpoint.

Defendants worked at the 20th and Hawthorne project from February 16 to March 26, 2009. Muñoz promised to pay defendants $10 per hour. He paid Jorge $1,100 and Felix $1,200, all in cash, and then failed to make any further payments.

Jose Ceja, Jr., who is Nacho Ceja's nephew, was plaintiff's on-site supervisor for the 20th and Hawthorne project. He would learn from Lorentz Bruun's foreman which areas or apartment units were ready for drywall hanging and taping and pass that information on to Muñoz, who would tell the taping crew where to work. Jose Ceja, Jr., was also responsible for the safe performance of all the drywall work at the site. That was true whether the safety risk was to plaintiff's workers, Viewpoint's workers, or any other worker on the site.

The trial court determined that, although Jose Ceja, Jr., may have interacted directly with defendants about their work on occasion, "such direct interaction was minor and incidental." More often, Jose Ceja, Jr., spoke to Muñoz about any problems with the crew's work; defendants and other crew members were often nearby and overheard those conversations. Jose Ceja, Jr., did not set the construction

schedule or require defendants to work more hours when the work fell behind schedule, although he did communicate with Muñoz as necessary to ensure that Viewpoint completed the subcontract in a timely manner.

Defendants first complained to Muñoz about his failure to pay them, and he told them to be patient. In March, they stopped working on the project because they had not been paid. In the end of June, defendants told Nacho Ceja that they had not been paid. Soon after, they brought wage claims against plaintiff and Viewpoint before the CCB.

In response, pursuant to *former* ORS 701.148(4) (2007), *repealed by* Or Laws 2011, ch 630, § 53,[4] plaintiff brought this declaratory judgment action against defendants and Viewpoint, seeking, among other things, a declaration that defendants "do not possess any justiciable right over which a legal claim may be brought for wages, penalty wages, penalties or attorneys fees in any form before the [CCB] or any court." Defendants counterclaimed for Oregon minimum-wage and overtime compensation, ORS 653.025, ORS 653.055, ORS 653.261; penalties for failure to promptly pay wages, ORS 653.055, ORS 652.150; federal minimum-wage and overtime compensation under the FLSA; and breach of contract.[5] They sought their unpaid wages, overtime

---

[4] *Former* ORS 701.148(4) provided, in part:

"A party to a complaint that is subject to a [CCB] order of binding arbitration under subsection (1) of this section may avoid the arbitration if the party requests to have the complaint resolved through a contested case hearing or files a court action."

[5] ORS 653.010(2) defines "employ," for purposes of ORS 653.010 to 653.261, to include "to suffer or permit to work." ORS 653.025(1) establishes a minimum wage "for each hour of work time that the employee is gainfully employed." ORS 653.261 authorizes the Commissioner of the Bureau of Labor and Industries to adopt rules regarding, *inter alia*, overtime pay. ORS 653.055 creates a cause of action for enforcement of ORS 653.025 and rules established under ORS 653.261:

"(1) Any employer who pays an employee less than the wages to which the employee is entitled under ORS 653.010 to 653.261 is liable to the employee affected:

"(a) For the full amount of the wages, less any amount actually paid to the employee by the employer; and

"(b)   For civil penalties provided in ORS 652.150.

"(2) Any agreement between an employee and an employer to work at less than the wage rate required by ORS 653.010 to 653.261 is no defense to an action under subsection (1) of this section."

wages, penalty wages, and attorney fees. Neither plaintiff nor defendants could locate Viewpoint or Muñoz, and the trial court entered a default judgment against Viewpoint.

The case went to trial. After the close of the evidence, defendants voluntarily dismissed their breach-of-contract counterclaim. The trial court found that, under Oregon's minimum-wage and overtime laws, Jorge should have been paid an additional $1,256.20 and Felix should have been paid an additional $1,005.00. However, the court determined that plaintiff did not "employ" defendants within the meaning of ORS 653.010(2) and, therefore, plaintiff was not obliged to pay defendants' wages. The court also determined that defendants had failed to prove that the FLSA applied to plaintiff. It entered a judgment declaring that defendants were not employed by plaintiff and, for that reason, rejecting defendants' counterclaims under Oregon minimum-wage and overtime law.

The trial court also concluded that defendants' attempt at trial to prove that the FLSA was applicable, which was based on a series of inferences that the court did not find persuasive, was unreasonable in light of the lack of evidence. Consequently, it awarded plaintiff an enhanced prevailing party fee of $5,000 under ORS 20.190(3) and $5,000 in attorney fees under ORS 20.105.

Defendants appeal, contending that the trial court erred in concluding that they were not employees of plaintiff for purposes of Oregon's minimum-wage and overtime statutes and that the court abused its discretion in awarding plaintiff attorney fees and an enhanced prevailing party fee on defendants' FLSA claim. We address those issues in turn, beginning with whether defendants were employed by plaintiff.

## II. "EMPLOY" AS USED IN ORS 653.010

ORS 653.025(1) provides that, with exceptions not relevant here, "no employer shall employ * * * any employee" at a wage lower than the "Oregon minimum wage" defined in ORS 653.025(2). "'Employer' means any person who employs another person * * *." ORS 653.010(3). "'Employ'

includes to suffer or permit to work * * *." ORS 653.010(2).[6] ORS chapter 653 does not define "employee."

In the trial court, the parties disagreed about how the trial court should interpret the definition of "employ" in ORS 653.010(2). Each party proposed a different test; in general, the test that plaintiff advocated defines the employment relationship more narrowly than the test that defendants advocated. Plaintiff also contended, in the alternative, that even under the test that defendants proposed, it did not employ defendants.

Because the dispute about which test to apply is one of the major issues on appeal, we pause here to provide some background about the two tests. Defendants argued that the trial court should apply the "economic-realities test." Federal courts apply that test to determine whether a worker is employed within the meaning of the FLSA. Like ORS 653.010(2), the FLSA defines "employ" to include "to suffer or permit to work." 29 USC § 203(g). That definition of "employ" originated in child-labor statutes intended to impose liability on individuals and corporations who engaged children to work for them directly or who suffered or permitted children to work for others involved in the enterprise. *See, e.g., People ex rel Price v. Sheffield Farms-Slawson-Decker Co.*, 225 NY 25, 33, 121 NE 474 (1918) (farm "permitted" hiring of children although farm prohibited the practice by rule and occasional inspection); *Curtis & Gartside Co. v. Pigg*, 39 Okla 31, 134 P 1125, 1129 (1913) (company "suffered" or "permitted" child to work at dangerous task by instructing him to do so although his contract of employment did not cover the dangerous task). After Congress adopted the phrase "to suffer or permit to work" to define "employ" in the FLSA, the United States Supreme Court adopted the economic-realities test to

---

[6] ORS 653.010(2) provides:

"'Employ' includes to suffer or permit to work but does not include voluntary or donated services performed for no compensation or without expectation or contemplation of compensation as the adequate consideration for the services performed for a public employer referred to in subsection (3) of this section, or a religious, charitable, educational, public service or similar nonprofit corporation, organization or institution for community service, religious or humanitarian reasons or for services performed by general or public assistance recipients as part of any work training program administered under the state or federal assistance laws."

capture that broader employment relationship. *Goldberg v. Whitaker House Co-op., Inc.*, 366 US 28, 33, 81 S Ct 933, 6 L Ed 2d 100 (1961); *Rutherford Food Corp. v. McComb*, 331 US 722, 728-29, 67 S Ct 1473, 91 L Ed 1772 (1947) (*Rutherford*).

Because of that history, the economic-realities test is recognized to be broader than common-law tests for employment. As the Supreme Court has explained, the FLSA's definition of "employ" is "'comprehensive enough to require its application to many persons and working relationships, which prior to [enactment of the FLSA], were not deemed to fall within an employer-employee category.'" *Rutherford*, 331 US at 729 (quoting *Walling v. Portland Terminal Co.*, 330 US 148, 150-51, 67 S Ct 639, 91 L Ed 809 (1947)). The test represents a "reject[ion of] the common-law definition of employment, which is based on limiting concepts of control and supervision." *Antenor v. D & S Farms*, 88 F3d 925, 929 (11th Cir 1996). Instead, the focus of the test is whether "an entity has functional control over workers even in the absence of the formal control" that is the focus of common-law tests. *Zheng v. Liberty Apparel Co. Inc.*, 355 F3d 61, 72 (2d Cir 2003). The goal of the economic-realities test is to determine whether, "as a matter of economic reality, [the worker] is dependent on the [putative employer]." *Antenor*, 88 F3d at 929.

Defendants contended that, because the Oregon legislature adopted the FLSA's definition of "employ," the test for employment under ORS 653.010 should be the economic-realities test, as applied in federal courts, rather than the "right-to-control test" that Oregon courts apply in a number of other contexts.

Plaintiff disagreed, contending that, under some of our cases, the court was required to apply the right-to-control test in interpreting ORS 653.010(2). That test derives from common law, and its focus is on the putative employer's formal control over workers. *See, e.g., Henn v. SAIF*, 60 Or App 587, 591, 654 P2d 1129 (1982), *rev den*, 294 Or 536 (1983) ("The principal factors showing right of control are: (1) direct evidence of the right to or the exercise of control; (2) the method of payment; (3) the furnishing of equipment;

and (4) the right to fire."). Oregon courts employ forms of the right-to-control test under a variety of statutes that define the employment relationship in terms of direction and control or a contractual relationship. *See, e.g.*, ORS 656.005(13) (defining "employer," for purposes of the workers' compensation statutes, as "any person * * * who contracts to pay a remuneration for and secures the right to direct and control the services of any person"); ORS 657.030 - 657.094 (defining "employment," with numerous exceptions, for purposes of the unemployment insurance statutes, as "service for an employer * * * performed for remuneration or under any contract of hire, written or oral, express or implied").

The trial court noted that "the appellate case law interpreting the Oregon statute on this point is not very illuminating." Based on some of that case law, the court agreed with defendants that the economic-realities test applies to employment determinations for the purposes of ORS chapter 653. However, the court agreed with plaintiff's alternative argument that, even under that test, plaintiff did not employ defendants.

On appeal, the parties renew the arguments they made below. Defendants point out that the provisions of ORS chapter 653 "are patterned after the [FLSA]," *State ex rel Roberts v. Acropolis McLoughlin, Inc.*, 149 Or App 220, 223, 942 P2d 829 (*Acropolis I*), *adh'd to as modified on recons*, 150 Or App 180, 945 P2d 647 (1997) (*Acropolis II*); *Northwest Advancement v. Bureau of Labor*, 96 Or App 133, 136 n 4, 772 P2d 943, *rev den*, 308 Or 315 (1989), *cert den*, 495 US 932 (1990), in that, like the FLSA, it defines "employ" to include "to suffer or permit to work" and contains no standalone definition of "employer" or "employee." ORS 653.010 (defining "employ" to include "to suffer or permit to work"; defining "employer" as "any person who employs another person * * *"); 29 USC § 203(g). Plaintiff remonstrates that our case law indicates that the right-to-control test is the relevant test under ORS chapter 653.

As the trial court noted, and as discussed in more detail below, our case law on the issue is inconsistent. In some cases, we have indicated that the economic-realities

test applies, and, in others, we have indicated that the right-to-control test applies. As explained above, 260 Or App at 94-95, the two tests are intended to capture different groups of relationships. The right-to-control test covers a core group of employment relationships in which the employer exercises, or has the right to exercise, direct control over the worker. By contrast, the economic-realities test covers a broader group of relationships, including some situations where the worker is not directed or controlled by the employer but, nevertheless, as a matter of economic reality, depends on the employer such that the employer is responsible for ensuring that the worker receives at least minimum wage.

Because the tests are aimed at different groups of relationships and because our case law fails to provide guidance to litigants, agencies, and trial courts as to which test applies, we now address the question. We consider the text, context, and legislative history of ORS 653.010(2) to determine which test the legislature intended courts to apply. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We conclude that the legislature intended courts to apply the economic-realities test under ORS 653.010(2), and we overrule our prior cases to the extent that they conflict with that holding.

We begin with the text of the statute, viewed in context. *Gaines*, 346 Or at 171. In patterning Oregon's minimum-wage provisions after the FLSA and adopting the FLSA's definition of "employ," the legislature adopted an established term of art from federal law. In 1967, when the legislature enacted the minimum-wage provisions, the leading United States Supreme Court case interpreting the definition of "employ" under the FLSA was, and had been for many years, *Rutherford*. In that case, the Court applied the economic-realities test and explained that the FLSA's definition of "employ" applies to "'many persons and working relationships, which prior to [enactment of the FLSA], were not deemed to fall within an employer-employee category.'" 331 US at 729 (quoting *Walling*, 330 US at 150). Thus, when the legislature defined "employ" to include "to suffer or permit to work," ORS 653.010(2), the broad scope of that definition

and the applicability of the economic-realities test had been established in federal law for at least 20 years.

The legislative history supports the understanding that, in defining "employ" to include "to suffer or permit to work," the legislature intended to include more relationships than are included under the right-to-control test. As described below, the legislative history shows that the committee that first considered the bill recognized that defining "employ" to include "to suffer or permit to work" captured more relationships than a more traditional definition that turned on the employer's right to direct and control the worker.

In 1967, the legislature enacted the provision that became ORS 653.010 as the definitions section of Oregon's first comprehensive minimum-wage law. Or Laws 1967, ch 596, § 2. The first version of the bill, House Bill (HB) 1340 defined "employ" as it is defined now: to include "to suffer or permit to work." That version also provided, "'employer' means *any person who contracts for and secures the right to direct and control the services of an employe,* and includes any person acting in the interest, directly or indirectly, of an employer in relation to an employe." HB 1340 Re-Engrossed and Enrolled (1967) (emphasis added). That definition of "employer" made a person's status as an employer contingent on the person's right to direct and control workers.

During the first public hearing on the bill, before the House Committee on Labor and Management, Belton Hamilton, who represented the Bureau of Labor, offered amendments, including modification of that definition of employer. Minutes, House Committee on Labor and Management, HB 1340, Mar 10, 1967, 2. Hamilton explained that the definition of "employer" needed modification because it was narrower than the definition of "employ." He informed the committee that, if the original definition were not modified, it would be possible for a person to be employed within the meaning of the bill, but, nevertheless, for the person who employed him or her not to be an employer. *Id.*[7] That

---

[7] Audio recordings of the March 10, 1967, session of the House Committee on Labor and Management are unavailable; the minutes are the only archived record of the session.

explanation reflects an intention that the phrase "to suffer or permit to work" should encompass more relationships than a traditional right to direct and control: If the definition of "employer" referred to the right to direct and control the worker's services, some people who suffered or permitted workers to work—that is, people who "employ[ed]" workers—would not qualify as employers.

The committee adopted the amendments. Minutes, House Committee on Labor and Management, HB 1340, Mar 17, 1967, 4. The new definition of employer provided, as it does today, that "'[e]mployer' means any person who employs another person." HB 1340 Re-Engrossed and Enrolled (1967); ORS 653.010(3). Thus, the committee replaced the "contracts for and secures the right to direct and control" wording of the original definition of "employer" with a definition of "employer" that relies on the definition of "employ" for its content. That action, considered with Hamilton's explanation that the original definition of "employer" was narrower than the definition of "employ," demonstrates that the committee intended the definition of "employ" in ORS 653.010 to encompass more relationships than the right-to-control definition.

Thus, the text of the statute and its legislative history support the conclusion that the legislature intended the definition of "employ" in ORS 653.010 to sweep more broadly than the right-to-control test. The choice of the text "to suffer or permit to work," whose meaning was well established in federal law at the time, suggests that the legislature intended Oregon courts to apply that broader definition through the economic-realities test.

Although we have stated, in some of our cases on the topic, that the right-to-control test applies, the foregoing analysis persuades us that those statements are incorrect. The main case holding that we apply the right-to-control test in evaluating an employment relationship under ORS 653.010 is *Chard v. Beauty-N-Beast Salon*, 148 Or App 623, 941 P2d 611 (1997). In *Chard*, the plaintiff sued the defendant, a salon, arguing that the defendant had employed her within the meaning of ORS 653.010 while she operated a tanning bed at the salon and performed salon-related tasks.

The defendant responded that it did not employ the plaintiff; as to the plaintiff's tanning-related tasks, it contended, the plaintiff was a lessee of the tanning bed, and, as to the plaintiff's salon-related tasks, the plaintiff was an independent contractor. *Id.* at 625, 628.

With regard to the meaning of "to suffer or permit to work," we held:

> "In distinguishing an employee from an independent contractor for purposes of ORS chapter 653, we and the Oregon Bureau of Labor and Industries (BOLI) employ the common-law 'right of control' test. *See, e.g., Harvey v. Employment Division,* 66 Or App 521, 524, 674 P2d 1204 (1984); *In the Matter of U.S. Telecom International,* 13 BOLI 114, 120-21 (1994)."

*Chard,* 148 Or App at 628. We then applied the "right-of-control" factors that BOLI had employed in resolving a wage claim under ORS chapter 652, which defines the employment relationship differently than ORS 653.010. ORS 652.310(1) ("'Employer' means any person who in this state \* \* \* engages personal services of one or more employees \* \* \*."); *In the Matter of All Season Insulation Company, Inc.,* 2 BOLI 264, 272, 274-77 (1982) (concluding that "[a]t all times material, the Employer \* \* \* was an employer *subject to the provisions of ORS 652.310 to 652.405, 652.140, and 652.150*" (emphasis added)). We also noted that "the parties do not raise or urge any other formulation or test." *Chard,* 148 Or App at 630 n 7. We have applied *Chard*'s holding in one other case, *Perri v. Certified Languages International, LLC,* 187 Or App 76, 82, 66 P3d 531 (2003), in which we cited *Acropolis I* (which cited *Chard*) for the proposition that "Oregon courts generally have used a common-law 'right to control' test in determining the status of a worker."

There are at least three reasons—apart from the text and legislative history of ORS 653.010 set out above— to doubt the correctness of *Chard*'s holding that the right-to-control test applies to the definition of "employ" in ORS 653.010. First, and most significantly, the authority that we cited for that proposition does not support it. Our holding in *Chard* rested on a citation to *Harvey v. Employment Division,* 66 Or App 521, 524, 674 P2d 1204 (1984). *Harvey*

involved a claim for unemployment tax by the Employment Division under ORS 657.040. We concluded that the petitioner had employed a minor because the minor was not "free from the employer's control and direction." *Harvey*, 66 Or App at 523, 525. Thus, the legal issue in *Harvey*—the meaning of "free from the employer's control and direction" as used in ORS 657.040—was unrelated to the proposition for which we cited it in *Chard*—the meaning of "to suffer or permit to work" in ORS 653.010.[8]

The second reason to doubt our holding in *Chard* is that, when we decided *Chard*, we had already construed the definition of "employ" in ORS 653.010 in accordance with the FLSA. In *Northwest Advancement*, we noted that "to suffer or permit to work," ORS 653.010, is adopted from the FLSA and construed it by reference to federal authorities interpreting the FLSA. 96 Or App at 136-37. We did not mention *Northwest Advancement* in *Chard*.

Finally, although we have never overruled *Chard*, we have never accepted it as conclusively settling the question that it purports to answer. Almost immediately after we decided *Chard*, we noted the relationship between the minimum-wage provisions of ORS chapter 653 and the FLSA and suggested that the question of which test applies remained open: In *Acropolis I*, we acknowledged our holding in *Chard* but noted that "[t]he minimum wage provisions and definitions in ORS chapter 653 are patterned after the [FLSA]," and we declined to decide which test applied because the dispute was not preserved. 149 Or App at 223-26. In *Acropolis II*, we responded to BOLI's contention that we should decide which test applied by stating, "This court will take up [the issue of which test applies in state

---

[8] In *Harvey*, we did mention the minimum-wage law, ORS 653.025, and the definition of "employ" in ORS 653.010(2), but that reference was made in passing during a discussion of whether a minor who worked for the defendant was an employee for unemployment-tax purposes—that is, under ORS 657.040. 66 Or App at 524 ("While the evidence does not show whether the payment to [the minor, which had been labeled a gift,] was equal to or greater than the minimum wage for the time he spent, *the payment was legally not a gift but a wage for his services, and he was thus employed for remuneration* [under ORS 657.040]." (Emphasis added.)). Thus, contrary to our statement in *Chard*, in *Harvey*, we did not apply the common-law right-to-control test to distinguish an employee from an independent contractor for purposes of ORS chapter 653.

minimum-wage cases] when it is argued on appeal *and* preserved at trial." 150 Or App at 184 (emphasis in original).

In the most recent case addressing the question, we distinguished all of our prior cases on the ground that they involved purported independent contractors while the case then before us required us to determine whether the purported employee was jointly employed. *Dinicola v. State of Oregon*, 246 Or App 526, 544-45, 268 P3d 632 (2011), *rev den*, 352 Or 377 (2012), *cert den*, ___ US ___, 134 S Ct 66 (2013). After making that distinction, we readily reached the opposite conclusion from the one we reached in *Chard* and held that the economic-realities test applied to the state-law claims at issue in the case. *Dinicola*, 246 Or App at 544. Although it is true that the facts in *Dinicola* differed from those in our earlier cases—in the earlier cases, the question was whether the purported employees were independent contractors, whereas the question in *Dinicola* was whether the purported employee was jointly employed—there is only one definition of "employ" in ORS 653.010, and it appears to apply to both independent-contractor and joint-employment situations. In the absence of any textual indication to the contrary, it is unlikely that the legislature intended courts to define "employ" more or less broadly depending on whether the question was one involving independent contractors or joint employment.[9]

In sum, in *Chard*, we mistakenly relied on *Harvey* for the proposition that the right-to-control test applied to minimum-wage claims under ORS chapter 653. In earlier and subsequent cases, we recognized that ORS 653.010's definition of "employ" is the same as the FLSA's definition of "employ" and variously stated and suggested that the economic-realities test should apply. We have minimized our holding in *Chard*, indicated that it did not answer the question conclusively, and attempted to distinguish it. We have never provided any analysis to support its conclusion, and our present analysis of the text of ORS 653.010(2) and

---

[9] Our holding in this case does not preclude the possibility that, under the economic-realities test, different factors may be relevant in independent-contractor and joint-employment situations. *See* 260 Or App at 106 (noting that we accept the factors applied by the trial court in this case as correct and complete because the parties do not dispute them).

its legislative history demonstrates that its holding contradicts the legislature's intent. Accordingly, we now overrule *Chard* and disavow statements in subsequent cases suggesting its correctness. We will apply the economic-realities test to determine whether a given relationship is an employment relationship under ORS 653.010(2).

### III. APPLICATION OF THE ECONOMIC-REALITIES TEST

As noted above, our goal in applying the economic-realities test is to determine whether, "as a matter of economic reality, [the worker] is dependent on the [putative employer]." *Antenor*, 88 F3d at 929. As the Second Circuit has explained, the test "is intended to expose outsourcing relationships that lack a substantial economic purpose, but it is manifestly not intended to bring normal, strategically oriented contracting schemes within the ambit of the FLSA." *Zheng*, 355 F3d at 76. That is so because an outsourcing relationship that lacks a substantial economic purpose is likely "a subterfuge meant to evade the FLSA or other labor laws." *Id.* at 72.

The factors that federal courts consider in applying the economic-realities test—and those that the trial court considered in this case—are based on the Supreme Court's analysis in *Rutherford. See, e.g., Zheng*, 355 F3d at 72 (listing and discussing factors from *Rutherford*); *Antenor*, 88 F3d at 930-31 (discussing *Rutherford*). Accordingly, we discuss that case in some detail. In *Rutherford*, the Administrator of the Wage and Hour Division of the Department of Labor alleged that the Rutherford Food Corporation and a related corporation, Kaiser Packing Company, employed butchers but paid them less than minimum wage. 331 US at 724. The butchers worked in a room in Kaiser's meat-processing plant into which Kaiser employees brought prepared carcasses on an overhead rail. The butchers moved the carcasses around the room on the rail, each taking part of the carcass for boning. They put the boned meat into barrels provided by Kaiser, and employees of Kaiser trimmed the meat in the same room, as necessary. Then Kaiser employees moved the barrels out of the room for the next step of the process. *Id.* at 725-26.

Kaiser originally agreed to pay Reed, the head butcher, by the hundredweight of boned meat; Reed shared that payment equally with the other butchers. When Reed left the work after a little more than a year, Kaiser contracted on the same terms with a series of other head butchers. The butchers provided their own meat hooks, knives, sharpeners, and aprons. The plant manager often went through the room where the butchers worked and exhorted them to get all the meat off the carcasses. The butchers' work rate was determined by the number of cattle slaughtered at the plant; they had to keep up with the carcasses brought into their room.

The district court concluded that the butchers were independent contractors, not employees; the Tenth Circuit disagreed and reversed. 331 US at 723. The Supreme Court concluded that the butchers were employees of Kaiser. It disagreed with the district court's evaluation, explaining:

> "We think, however, that the determination of the relationship *** depend[s] *** on the circumstances of the whole activity. Viewed in this way, the workers did a specialty job on the production line. The responsibility under the boning contracts without material changes passed from one [butcher] to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughter-house to another. The managing official of the plant kept close touch on the operation. While profits to the [butchers] depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor. Upon the whole, we must conclude that these [butchers] were employees of the slaughtering plant under the Fair Labor Standards Act."

*Rutherford*, 331 US at 730.

Thus, the Court's reasoning is organized around two main themes, with some degree of overlap: the integration of the workers into the employer's production process and the lack of any independent workers' business organization. First, the workers' integration into the production process

was significant because it was not temporary or sporadic; the workers formed part of the permanent production line and the employer could not produce any finished product without their participation.[10] The individuals doing the work remained the same, and were paid the same way, through the tenure of several managers, indicating that they were primarily associated with the employer's operation.

Second, the workers were not part of any independent businesses or joint business organization. The workers did not work elsewhere, alone or as a group, and the employer's overseer directed their work. They worked on the premises and with equipment of the employer, and they had no significant risk of loss and no enterprise that was dependent on their initiative, judgment, or foresight. Finally, their rate of pay, which was based on production, remained the same over several contracts, and they could not control their rate of production because it depended on the speed of the rest of the production process. Thus, Kaiser, rather than another employer or the butchers themselves, had *de facto* control over the butchers' pay.

---

[10] We note that the fact that the workers are a necessary part of the employer's production, alone—like any single fact—does not determine the outcome of the inquiry. For example, the fact that the services of a plumber are necessary to the successful completion of every home-building project undertaken by a general contractor, in the absence of other facts indicating that the plumber is actually an employee, is not sufficient to show an employment relationship. If the general contractor always employs the same plumber, at the same rate, and the plumber works for no one but the general contractor, it may be a closer case. However, even under those circumstances, many other factors may be relevant, including the existence of an open bidding process, the length of time that the exclusive relationship exists, and evidence of industry custom and historical practice.

In *Zheng*, the Second Circuit noted that industry custom and historical practice may be relevant to whether there is a substantial economic reason for outsourcing part of a firm's production process or, conversely, whether outsourcing is a subterfuge meant to avoid labor laws. It explained:

"Industry custom may be relevant because, insofar as the practice of using subcontractors to complete a particular task is widespread, it is unlikely to be a mere subterfuge to avoid complying with labor laws. At the same time, historical practice may also be relevant, because, if plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may, in particular circumstances, be attributable to widespread evasion of labor laws."

355 F3d at 73-74. Both industry custom and historical practice could be relevant here, but there is no evidence on either of those issues in the record before us.

In this case, after determining that the economic-realities test applied, the trial court noted that the parties "largely agree[d]" on the factors that it should apply under that test. The first group of factors, which the parties and the court referred to as the "regulatory" factors, relate to whether the putative employer formally controls the terms and conditions of the worker's employment.[11] The second group of factors, referred to as the "nonregulatory" factors, are derived from *Rutherford* and assist the court in determining whether, notwithstanding the absence of formal control, the putative employer nevertheless functionally controls the terms and conditions of employment. The trial court summarized the factors as follows:

> "The 'regulatory factors' are (1) the nature and degree of control of the workers; (2) the degree of supervision of the work, whether direct or indirect; (3) the power to determine the rates or methods of payment; (4) the right to hire, fire or modify employment conditions, either directly or indirectly; and (5) the preparation of payroll and the payment of wages.

> "The 'non-regulatory factors' (derived from case law, especially *Rutherford* ***) are (1) whether the work was a specialty job on the production line; (2) whether responsibility under the contracts passed from one subcontractor to another without material changes; (3) who controls the premises and equipment used for the work; (4) whether the group of workers had a business organization that could or did shift as a unit from one employer to another; (5) the level of supervision over the work; (6) whether the success of the workers' enterprise depends on the initiative, judgment or foresight of the typical independent contractor; (7) whether there is permanence and exclusivity in the working relationship; and (8) whether the service rendered is an integral part of the putative employer's business."

Those factors are the same ones that defendants advocate on appeal.[12] Because the parties do not dispute them, we accept them as correct and complete for purposes of this appeal.

---

[11] The "regulatory factors" are so called because they derive from federal regulations interpreting the Migrant and Seasonal Agricultural Worker Protection Act, 29 USC §§ 1801-72, which incorporates the definition of "employ" from the FLSA. *Amiable v. Long and Scott Farms*, 20 F3d 434, 439 (11th Cir), *cert den*, 513 US 943 (1994).

[12] Defendants note that the fifth nonregulatory factor listed by the trial court duplicates the second regulatory factor.

In light of those factors, viewed as a whole and understood in light of the Supreme Court's analysis in *Rutherford*, we agree with the trial court that plaintiff neither formally nor functionally controlled the terms and conditions of defendants' employment. To the contrary, the evidence indicates that plaintiff had a "substantial economic purpose" for entering into the subcontracting arrangement here and that it was not a subterfuge intended to avoid labor laws. *Zheng*, 355 F3d at 76. Defendants were not economically dependent on plaintiff; rather, plaintiff was a "mere business partner[] of [defendants'] direct employer." *Id.*

First, we consider the regulatory factors, and we conclude that plaintiff did not formally control the terms and conditions of defendants' employment. Plaintiff did not control defendants' work. Although Jose Ceja, Jr., occasionally spoke to defendants about their work, that interaction was aimed at ensuring site safety and the quality required by the subcontract; Jose Ceja, Jr., did not direct defendants' taping work. *See Zheng*, 355 F3d at 75 ("[S]upervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangment."). Plaintiff did not determine when, how, or how much defendants were paid; it contracted with Viewpoint for a price per square foot, and Viewpoint, through Muñoz, promised to pay defendants by the hour. Plaintiff also lacked the right to hire or fire defendants, did not control their work hours, and did not manage their payroll.

Next, we consider whether plaintiff functionally controlled the terms and conditions of defendants' employment. In doing so, we are guided by the Supreme Court's analysis in *Rutherford*. We begin with the integration of defendants into plaintiff's production process. In that regard, we note that plaintiff did not always subcontract out parts of its drywall projects. The 20th and Hawthorne project was the largest that plaintiff had ever undertaken, and Nacho Ceja decided to subcontract the production work because his crew was not capable of finishing the work on time. Although this was not the first time that plaintiff had subcontracted production work, no evidence indicates that it did so consistently. Thus,

unlike in *Rutherford*, where Kaiser could not produce any boned meat without the participation of the butchers, here, plaintiff could, and did, complete many drywall projects using only its own crew. *See Antenor*, 88 F3d at 937 (pickers were "dependent on the growers' overall production process, of which they were one small but indispensable part").

It is also significant that, at most, one of the two defendants may have worked on one of plaintiff's projects before. Unlike the butchers in *Rutherford*, who continued working in Kaiser's plant through the tenure of three head butchers, defendants had no significant association with plaintiff outside of the 20th and Hawthorne project, on which they worked for approximately six weeks. By contrast, they had worked for Muñoz in the past. When "employees are tied to an entity such as the slaughterhouse rather than to an ostensible direct employer such as the boning supervisor," "it is difficult *not* to draw the inference that a subterfuge arrangement exists." *Zheng*, 355 F3d at 74 (emphasis in original). "Where, on the other hand, employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, [that circumstance] does not in any way support the determination that a joint employment relationship exists." *Id.*

We turn now to whether defendants lacked independent businesses or a joint business organization. We conclude that they were part of an independent business operation—Viewpoint. Defendants worked for plaintiff for six weeks on one project. At other times, they had worked on many other projects, including projects where Muñoz was their supervisor. On the project at issue, Muñoz, not Jose Ceja, Jr., directed their work. Thus, defendants were part of a "business organization that could [and] did shift as a unit from one [drywall project] to another." *Rutherford*, 331 US at 730.

Because Viewpoint provided the business organization of which defendants were part, we evaluate whether that organization undertook a risk of loss and whether it was an enterprise that required initiative, judgment, and foresight.[13] We begin with the risk of loss. Viewpoint agreed

_____

[13] "[T]he amount of initiative or judgment required for a job * * * is of minimal value for deciding whether workers already acknowledged to be the employees of one employer should likewise be deemed the employees of the second

with plaintiff that it would complete the production drywall based on a price per square foot. It agreed with defendants that it would pay them by the hour. Thus, Viewpoint took the risk that its employees would not complete the work quickly enough to make a profit—or the profit that it anticipated—on the subcontract with plaintiff. It had an interest in ensuring that its employees worked quickly and efficiently, and Muñoz was present to direct the employees and protect Viewpoint's interest.

Similarly, the record indicates that Viewpoint was an enterprise dependent on initiative, judgment, and foresight—that is, it was a legitimate business and not merely a way for plaintiff to avoid labor laws. Nacho Ceja received bids from other subcontractors about the project before he awarded it to Viewpoint, and he made sure that it was properly licensed, bonded, and insured before awarding it the contract. As explained above, Viewpoint took a risk by bidding on the project at a square-foot price and promising to pay defendants by the hour. Although plaintiff provided the drywall and drywall mud for the project, defendants provided their own tools. In short, the facts in the record do not indicate that Viewpoint was an enterprise in name only; although it has failed to appear in this case, the record does not indicate that it was other than a legitimate business. Accordingly, we conclude that defendants were part of a business organization other than plaintiff.

Overall, the record does not show that plaintiff formally or functionally controlled the terms and conditions of defendants' employment. This was a typical subcontracting situation; while defendants were economically dependent on Viewpoint, they were not economically dependent on plaintiff. Thus, the trial court correctly held that plaintiff did not employ defendants within the meaning of ORS 653.010.[14]

---

employer, as it tests principally for a worker's independence from all employers rather than for a worker's dependence on a particular employer."

*Zheng*, 355 F3d at 74 n 10 (citations and internal quotation marks omitted).

[14] We reiterate that, in reaching that conclusion, we rely on the economic-reality test factors that defendants advanced in the trial court and on appeal, which, for the purposes of this opinion, we assume are correct and complete. 260 Or App at 106.

In doing so, the trial court properly rejected defendants' argument that the FLSA standard for employment reduces to only whether the putative employer was in a position to know of the violations and had the economic power to prevent them and that, under that standard, they were employed by plaintiff. Even assuming, for the sake of argument, that that is a legally correct way to understand the term "employ," defendants would not be employed by plaintiff under that test. The trial court noted that, in this case, "[plaintiff] was in a position to know how Viewpoint's workers, including defendants, were being paid only if it interjected itself into Viewpoint's operations to a much greater extent than one would assume is permissible under the subcontract or is customary in construction contracting."

We agree with the trial court that the record does not indicate that plaintiff had the right to, or did, interject itself into Viewpoint's operations so as to have reason to know that defendants had not been paid in time to exercise its economic power to prevent the violation. Although defendants rely on the fact that Muñoz admitted to Nacho Ceja that he owed defendants wages, they fail to note that that admission took place in late June, and plaintiff had paid Viewpoint in full under the subcontract in May. Defendants do not point to any facts in the record to support the view that plaintiff should have known of Viewpoint's unreliability before plaintiff paid Viewpoint.[15]

In sum, the trial court correctly held that plaintiff did not employ defendants within the meaning of ORS 653.010(2). Because that conclusion was correct, the trial court did not err in providing plaintiff with the declaratory relief that it sought or rejecting defendants' counterclaims based on Oregon minimum-wage and overtime laws.

---

[15] We note in particular that, contrary to the assertions of *amici curiae* in their brief, there is no evidence in the record that plaintiff made arrangements directly with Muñoz or that it had any notice of the fact—if true—that Viewpoint was a "fly-by-night" "labor contractor." Before entering into a contract with Viewpoint through its principal, Victor Rodriguez, Nacho Ceja made sure that Viewpoint was licensed, bonded, and insured. No evidence in the record, including the price per square foot that plaintiff paid Viewpoint for its work, indicates that plaintiff had any reason to suspect that Viewpoint was other than a legitimate drywall subcontractor that would pay its employees through its own payroll.

## IV. FEE AWARDS

We turn to defendants' remaining assignments of error. As explained above, defendants assign error to the trial court's award of $5,000 in attorney fees to plaintiff under ORS 20.105 and its award of a $5,000 enhanced prevailing party fee to plaintiff under ORS 20.190(3). Both awards stem from defendants' attempt, at trial, to prove that the FLSA applied to their claim because plaintiff was an "[e]nterprise engaged in commerce or in the production of goods for commerce." 29 USC §§ 203(s)(1), 206(a).

We begin with the attorney fee award. ORS 20.105(1) provides, as relevant here, that a circuit court "shall" award reasonable attorney fees to a party who prevails against a claim "upon a finding by the court * * * that there was no objectively reasonable basis for asserting the claim[.]"[16] Defendants do not dispute that plaintiff is the prevailing party. Instead, defendants argue that the trial court abused its discretion in awarding fees under ORS 20.105 because there was evidence from which a trier of fact reasonably could have concluded that the FLSA applied to plaintiff and because the court did not accord sufficient weight to the deterrent effect that such an award would have on potentially meritorious wage claims in the future. Plaintiff remonstrates that the court did not abuse its discretion because defendants' FLSA claim, as a whole, was unreasonable.

We first note that we review a trial court's conclusion that "there was no objectively reasonable basis for asserting [a] claim," ORS 20.105(1), for errors of law.[17] *Williams v. Salem Women's Clinic*, 245 Or App 476, 482, 263 P3d 1072

---

[16] ORS 20.105(1) provides, in full:

"In any civil action, suit or other proceeding in a circuit court or the Oregon Tax Court, or in any civil appeal to or review by the Court of Appeals or Supreme Court, the court shall award reasonable attorney fees to a party against whom a claim, defense or ground for appeal or review is asserted, if that party is a prevailing party in the proceeding and to be paid by the party asserting the claim, defense or ground, upon a finding by the court that the party willfully disobeyed a court order or that there was no objectively reasonable basis for asserting the claim, defense or ground for appeal."

[17] Before the trial court, plaintiff understood and argued that application of ORS 20.105 was a matter of law, but, on appeal, it fails to identify the correct standard in its brief and, as noted, formulates its argument in terms of abuse of discretion.

(2011); *Olson v. Howard*, 237 Or App 256, 264-65, 239 P3d 510 (2010). "A claim lacks an objectively reasonable basis only if it is entirely devoid of legal or factual support, either at the time it is made or, in light of additional evidence or changes in the law, as litigation proceeds." *Williams*, 245 Or App at 482 (citation and internal quotation marks omitted).

The outcome of that inquiry "is a function of the substantive law governing the claim." *Olson*, 237 Or App at 269 (internal quotation marks omitted). Here, the parties agree that, under defendants' theory that the FLSA applied to plaintiff through "enterprise liability," defendants had to show that plaintiff was an "[e]nterprise engaged in commerce or in the production of goods for commerce." 29 USC §§ 203(s)(1), 206(a). Specifically, defendants had to prove that plaintiff

"(i)   has employees engaged in commerce or in the production of goods for commerce, or * * * has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

"(ii)   is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)[.]"

29 USC § 203(s)(1)(A).

Although defendants lacked direct evidence of plaintiff's annual gross volume of sales, they presented a series of inferences, based on plaintiff's gross receipts from the 20th and Hawthorne contract and evidence about the cost of materials and plaintiff's payroll, from which they contended that the trial court could determine that plaintiff's annual gross volume of sales exceeded $500,000. They also presented evidence that one of the products with which plaintiff's employees worked was trademarked, from which they argued that the court could conclude that plaintiff had "employees handling * * * goods or materials that have been moved in or produced for commerce by any person." 29 USC § 203(s)(1)(A)(i).

In its letter opinion, the trial court determined that defendants had not proved that the FLSA applied through "enterprise liability." It found that "the inferences and extrapolations on which defendants rely *** are too attenuated and speculative to support the conclusion they seek." After plaintiff sought attorney fees under ORS 20.105(1), the court concluded that there was no objectively reasonable basis for defendants' argument that the FLSA applied.

The court erred in so concluding. As noted, in determining whether there was a reasonable factual basis for a claim, the question is whether the record is "entirely devoid of *** factual support" for the claim. *Williams*, 245 Or App at 482 (internal quotation marks omitted). Here, although the court ultimately found defendants' evidence unpersuasive, there was some evidence in the record supporting defendants' position. *See, e.g., Morasch v. Hood*, 232 Or App 392, 404-05, 222 P3d 1125 (2009) ("Although *** the evidence relating to damages was not legally sufficient to sustain the claim for fraud, we cannot conclude *** that plaintiffs' [fraud] claim was without an objectively reasonable basis."). Accordingly, the trial court erred in awarding plaintiff attorney fees under ORS 20.105.[18]

Finally, we consider defendants' third assignment of error, in which they challenge the trial court's award of an enhanced prevailing party fee of $5,000 pursuant to ORS 20.190(3). We review such awards for abuse of discretion. *Mantia v. Hanson*, 190 Or App 412, 431, 79 P3d 404 (2003). One of the factors that a court must consider, and that the

---

[18] Plaintiff moved for a directed verdict on the applicability of the FLSA, and the trial court took the matter under consideration. It did not rule on the motion for directed verdict but, in the letter opinion, noted that, "[w]hile [defendants'] evidence [on the issue] might survive a motion for directed verdict, I do not find it persuasive."

Later, in evaluating whether there was an objectively reasonable basis for defendants' claims, the court explained that, when it stated that the evidence might survive a motion for directed verdict, "I was trying to be kind in my language. It was the thinnest of reeds." It noted that the standard for a directed verdict and an attorney fee award are not the same and concluded that there was no objectively reasonable basis for defendants' claim.

As explained above, regardless of the sufficiency of defendants' evidence to survive a directed verdict, the record was not "entirely devoid of *** factual support" for their claim. Consequently, plaintiff was not entitled to attorney fees under ORS 20.105(1).

trial court did consider, in ordering the enhanced prevailing party fee, is "[t]he objective reasonableness of the claims and defenses asserted by the parties." ORS 20.190(3)(b). In light of our holding that the trial court erred in concluding that there was no objectively reasonable basis for defendants' FLSA claim, we must remand for the trial court to reconsider its enhanced prevailing party fee award. *See Morasch*, 232 Or App at 406; *Mantia*, 190 Or App at 431.

## V.  CONCLUSION

In sum, we conclude that the trial court did not err in holding that the economic-realities test applies under ORS 653.010(2). The court also did not err in concluding that plaintiff did not employ defendants under ORS 653.010(2), and it properly entered a declaratory judgment for plaintiff and rejected defendants' Oregon minimum-wage and overtime counterclaims on that basis. The trial court did err in concluding that there was no objectively reasonable basis for defendants' FLSA claim; as a result, we reverse the attorney fee award and remand for reconsideration of the enhanced prevailing party fee award.

Award of attorney fees pursuant to ORS 20.105 reversed; award of enhanced prevailing party fee pursuant to ORS 20.190(3) vacated and remanded for reconsideration; otherwise affirmed.